**In re COPLEY PHARMACEUTICAL, INC., "Albuterol" Products Liability Litigation.**

**No. MDL 94–1013.**

United States District Court, D. Wyoming.

June 3, 1999.

---

See also 1 F.Supp.2d 1407.

Stanley M. Chesley, Janet G. Abaray, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, Peter J. Brodhead, Spangenberg, Shibley & Liber, Cleveland, OH, Arnold Levin, Levin, Fishbein, Sedrad & Berman, Philadelphia, PA, James Ranney, Missoula, MT, David J. Guin, Donaldson, Guin & Slate, Birmingham, AL, in Support of Original Allocation.

Michael R. O'Donnell, Burke, Woodard & O'Donnell, Cheyenne, WY, Donald S. Edgar, Edgar & Associates, Santa Rosa, CA, Paul Rheingold, Rheingold, Valet & Rheingold, P.C., New York City, Lewis Saul, Saul & Fraser, Washington, D.C., Objectors.

Thomas A. Nicholas, III, Hirst & Applegate, P.C., Cheyenne, WY, for defendant Copley, but not objecting.

### ORDER DENYING MOTIONS TO RECONSIDER ALLOCATION OF ATTORNEYS' FEES[1]

BRIMMER, District Judge.

## I. Introduction

On November 23, 1998,[2] the Court issued an Amended Order adopting Lead Counsel's allocation of Attorneys' fees. Soon thereafter, some members of class counsel motioned the Court to reconsider its Order pursuant to Federal Rule of Civil Procedure 60(a) and 60(b). Specifically, Donald Edgar, Michael O'Donnell, Paul Rheingold, Lewis Saul, and Charles Schmidt filed objections to the Court's Order. The Court, being fully advised of the premises, **FINDS** and **ORDERS:**

## II. Historical Background

The relevant events leading to this matter are as follows: After forty-two days of trial, the parties were able to reach an amicable settlement. This Court ultimately approved this settlement. *See Order Approving Settlement,* Nov. 15, 1995. On April 30, 1998, upon the petition of class counsel, the Court awarded class counsel 13% of $150 million common fund in attorneys' fees. *See In re Copley Pharmaceutical, Inc.,* 1 F.Supp.2d 1407 (D.Wyo.1998). Accordingly, overall, class counsel were to receive $19.5 million. This award was "to be allocated amongst themselves by class counsel." *See id.* at 1418. "Class counsel" was defined as Lead Counsel and Plaintiffs' Steering Committee. *See id.* at 1408.

After the April 30, 1998, Order was issued, Stanley M. Chesley, ("Lead Counsel") created a broad-based steering committee to handle the attorney fee allocation. Lead Counsel scheduled a meeting in Cincinnati, Ohio, on May 28, 1998, and requested that the steering committee submit their self-evaluations as to how much they should be compensated. Unfortunately, the aggregate of those fee submissions was almost double the size of the award. It appears that this initial meeting became a boasting session in which the steering committee members would explain why their award should be so large. Unfortunately, no member proposed a fair solution on how to allocate the whole award.

The steering committee then formed a subcommittee to further consider allocations and make recommendations to it. After some time, however, it became evident to Lead Counsel that neither the steering committee nor the subcommittee could resolve the attorney fee allocation to the satisfaction of all parties. Hard decisions would eventually have to be made and somebody would always not agree. This result was no doubt due, in part, to the large size of the steering committee, something that the Court warned would cause problems in reaching a compromise.

At this point, Lead Counsel took a controversial step in the objectors' eyes: He took suggestions from steering committee members on fee awards and began negotiating with the attorneys on a one-on-one basis. It was and is Lead Counsel's opinion that a given attorney could fairly assess the value of their own work when that attorney knew the amount of the aggregate award.

Lead Counsel also enlisted the services of Faye Stilz. Ms. Stilz painstakingly reviewed the billing statements to verify their accuracy and otherwise assisted Lead Counsel with this task.

In making the final determinations, Lead Counsel not only considered the number of hours billed, but also the quality of a given lawyer's efforts. He considered whether hours billed were to the benefit of the class; that is, he considered whether

---

**1.** The Court recently addressed that part of the November 23, 1998, Order which dealt with expenses. This Order addresses attorneys' fees only.

**2.** The Court first issued an Order on November 18, 1998, but this Order was amended on November 23, 1998 due to a clerical error.

hours billed were for an individual client, or for the class as a whole, or whether the attorney billed hours for a cause that was to the detriment of the class (e.g., trying to decertify the class). He considered at what point a given attorney became involved in the litigation. He considered the complexity and novelty of issues involved that a given attorney worked on. Finally, he considered at what point in the litigation hours were billed and what role the attorney played at that phase in the litigation.

Notably, Lead Counsel kept discussions with class counsel members confidential. He did not let one attorney know what another attorney was being awarded. He did this because he did not want attorneys pitting themselves against others fighting over who received more fees, a wise decision.

Sometime in early November 1998, Lead Counsel wrote a letter to individual class counsel members stating what he had allocated as their fee. Lead Counsel then submitted this allocation to the Court with discussion. Lead Counsel's proposed allocation for fees and costs was as follows:

1. Peter J. Brodhead of Spangenberg, Shibley, Lancione & Liber: $2,391,580 in fees.

2. Elizabeth Cabraser and William B. Hirsch of Lieff, Cabraser, Heimann & Bernstein: $200,250 in fees.

3. Stanley M. Chesley of Waite, Schneider, Bayless & Chesley Co., L.P.A.: $6,985,000 in fees.

4. Donald S. Edgar of Edgar & Associates: $15,000 in fees.

5. Calvin C. Fayard, Jr., of Fayard & Honeycutt: $678,000 in fees.

6. Wendell Gauthier of Gauthier, Downing, Labarre & Dean: $565,000 in fees.

7. David J. Guin of Donaldson & Guin: $210,000 in fees.

8. Joseph C. Kohn of Kohn, Swift & Graf: $185,000 in fees.

9. Arnold Levin of Levin, Fishbein, Sedran & Berman: $700,000 in fees.

10. Robert B. Newman of Kircher, Robinson, Newman & Welch: $47,000 in fees.

11. Michael R. O'Donnell of Burke, Woodard & O'Donnell: $750,000 in fees ($600,000 of which will be disbursed now because Mr. O'Donnell received an advance of $150,000 in 1997).

12. James T. Ranney of the Law Offices of James T. Ranney: $405,000 in fees.

13. Paul D. Rheingold of Rheingold, Valet & Rheingold: $1,030,000 in fees.

14. Michael St. Martin of St. Martin & Williams: $624,000 in fees.

15. Lewis J. Saul of Lewis J. Saul, P.C.: $700,000 in fees.

16. Charles Schmidt, Jr., of Schmidt & Ronca, P.C.: $36,900 in fees.

17. W. Hugh Sibley of Sibley Law Firm: $618,000 in fees.

18. Gerry Spence of Spence Moriarty & Schuster: $61,000 in fees.

19. David Suggs of Brosnahan, Joseph, Lockhard & Suggs: $2,390,167 in fees.

This allocation was based on the following attorney and paralegal hours submitted to Lead Counsel as of August 1998:

| Attorney | Attorney/Paralegal Hours |
| --- | --- |
| Brodhead | 2180.5 |
| Cabraser & Hirsch | 1132.80 |
| Chesley | 6023.5 |
| Edgar [3] | 2200 |
| Fayard | 9589.75 |
| Gauthier | 2947 |
| Guin | 1706.56 |
| Kohn | 920.4 |
| Levin | 1887.25 |
| Newman | 208.90 |

**3.** Mr. Edgar did not submit any time records to Lead Counsel until November 1998. When these records finally were submitted, they contained numerous errors. Accordingly, Lead Counsel did not have any hours for Mr. Edgar on the August 1998 statement. The Court derived these numbers from a January 1998 submission.

| | |
|---|---|
| O'Donnell | 1261.4 |
| Ranney | 1398.5 |
| Rheingold | ·1938.5 |
| St. Martin | 5274.45 |
| Schmidt | 264.1 |
| Saul | 2409.6 |
| Sibley | 3284.25 |
| Spence | 458.15 |
| Suggs | 2053.5 |
| Totals | 47,139.11 |

The Court, after reviewing the proposed allocation and considering the efforts of all counsel, found that this was a fair and reasonable allocation of the fees and costs and approved the allocation. *See Amended Order on Fee Distribution,* November 23, 1998.

At a December 4, 1998, hearing on motion for reconsideration of the Court's fee allocation order, Mr. O'Donnell provided a break down in hours that is quite useful because it shows at what point in the litigation attorneys expended their hours.[4]

| Attorney | Disc. & pre-trial work | Trial Prep & Trail | Corr., meetings & other activity prior to stlmnt. (pre–8/22/95) | Post–Stlmnt. Work | Post–Stlmnt. Claims Office | Total Hours |
|---|---|---|---|---|---|---|
| Brodhead | 830.05 | 1078.45 | 0 | 272 | 0 | 2180.5 |
| Cabraser & Hirsch | 0 | 521 | 428.90 | 115.70 | 0 | 1065.60 |
| Chesley, Abaray | 1707.5 | 1560 | 0 | 2756 | 0 | 6023.5 |
| Edgar | ? | ? | ? | ? | ? | ? |
| Fayard | 0 | 1222.5 | 1727.5 | 0 | 6639.75 | 9589.75 |
| Gauthier | 0 | 0 | 1981.75 | 783 | 182.25 | 2947 |
| Guin | 1.9 | 114.40 | 1210.3 | 65.03 | 268.39 | 1660.02 |
| Kohn | 348.40 | 561 | 0 | 11 | 0 | 920.40 |
| Levin | 1036.75 | 446.75 | 0 | 254 | 149.75 | 1887.25 |
| Newman | 72 | 0 | 136.9 | 0 | 0 | 208.9 |
| O'Donnell | 23.5 | 1016.10 | 21 | 200.8 | 0 | 1261.4 |
| Ranney | 142 | 427.4 | 817.1 | 12 | 0 | 1398.5 |
| Rheingold | 1367.25 | 353.25 | 191 | 27 | 0 | 1938.5 |
| St. Martin | 75.5 | 580.75 | 1919.95 | 37 | 2416.25 | 5029.45 |
| Saul | 1213.2 | 975.25 | 46 | 175.15 | 0 | 2409.6 |
| Schmidt | 0 | 0 | 264 | 0 | 0 | 264 |
| Sibley | 0 | 0 | 1108.25 | 1750 | 4281 | 7139.25[5] |
| Spence | 0 | 0 | 457.95 | 0 | 0 | 457.95 |
| Suggs | 842.2 | 1152.85 | 0 | 0 | 295.9 | 2290.95 |
| Totals | 7660.25 | 10009.7 | 10310.6 | 6458.68 | 14233.29 | 48672.52 |

The day before the Court issued its first Order on Fee and Cost allocation, Mr. St. Martin and Mr. Rheingold filed motions requesting court assistance in allocating attorneys' fees. The Court has considered such motions as those for reconsideration of the fee order.

Following the Court's November 18, 1998, Order, and in rapid succession, other members of class counsel filed motions for

4. The Court notes that it has copies of the original billing records submitted to class counsel. In accordance with its duties, this Court has sampled the billing records for accuracy. The Court finds that the summary submitted by Mr. Chesley is accurate. The Court found that any deviation in Mr. O'Donnell's numbers from Lead Counsel's numbers was de minimus in the grand scheme of allocation.

5. A clerical error has since been discovered in Sibley's hours.

reconsideration. Although in the days up to and including the December 4, 1998, hearing many firms withdrew their motions for reconsideration, five class counsel members still object to the Court's Order. The following class counsel members are objecting: (1) Paul Rheingold, (2) Michael O'Donnell, (3) Charles Schmidt, (4) Lewis Saul, and (5) Donald Edgar.

### Discussion[6]

Needless to say, attorney fee allocation in this case is a very complex matter. The Court has thought quite carefully on how to address the arguments of the objectors to ensure the integrity of the Court's decision. Given the brevity of the Court's two prior Orders on fee allocation, it may be helpful to all involved to understand the Court's rationale for approving Lead Counsel's proposed allocation. Therefore, the Court will first explain its rationale. Second, the Court will explain the legal standards implemented previously and again today. Third, the Court will review the three largest allocations of trial counsel. Finally, the Court will address the arguments brought by the objectors.

### A. Rationale for Approving Lead Counsel's Proposed Fee Allocation.

■ Attorney fee allocation is an unenviable task for any court. It is a difficult matter that, frankly, even the trial court is often not in the best position to decide. This is especially true in complex class actions like the one at bar. In such a circumstance, "[i]deally, allocation is a private matter to be handled among class counsel." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D.Ga.1993) (citing Newberg, *Attorney Fee Awards* § 2.16 (1986)); *see also Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir.1992) (stating the circuit's approval of leaving the allocation of individual fees to the class attorneys). The rationale for this policy is both logical and practical.

Class counsel are better able to decide the weight and merit of each other's contributions. *See In re "Agent Orange" Product Liability Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (citing *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C.1978)). The *Ampicillin Antitrust Litigation* court put the matter succinctly:

In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk.

In sum, class counsel were there, working side by side, communicating frequently, and can better assess the relative worth of co-counsels' contributions.

■ Having this policy in mind, it had been the Court's hope that class counsel could decide the allocation themselves. Accordingly, per the standard practice in complex litigation, the Court first encouraged class counsel to stipulate to an allocation, subject to approval by this Court. *See* 1 Alba Conte, *Attorney Fee Awards* § 2.17 at 71 (2d ed.1993); *In re Copley Pharmaceutical, Inc. "Albuterol" Products Liability Litig.*, 1 F.Supp.2d at 1418. Unfortunately, with nearly $20 million at stake, class counsel were not able to unanimously agree on an allocation. To their credit, however, of the nineteen attorney/firms involved in this allocation, fourteen have agreed with Lead Counsel's proposed allocation.

■ To the extent a stipulation is not possible, allocation of attorneys' fees is left to the discretion of the trial court. *See Lucero v. Trinidad*, 815 F.2d 1384, 1386 (10th Cir.1987); *see also In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 309 (1st Cir.1995) (explaining that when reviewing a district court's allocation of fees among multiple counsel, the trial court's latitude is "extremely broad"); *In re Hori-*

---

**6.** Although this matter has brought before the Court on a motion to reconsider, the Court has conducted a *de novo* review of its prior allocation. Thus, the rigorous standards for a motion to reconsider have not been implemented today.

*zon/CMS Healthcare Corp. Sec. Litig.*, 3 F.Supp.2d 1208, 1211–15 (D.N.M.1998); 2 Mary Francis Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees*, ¶ 17.02 at 17–7 (1998); Conte, *supra* § 2.17 at 71. As stated by the Tenth Circuit: "An award of attorneys' fees is a matter uniquely within the discretion of the trial judge who 'has intimate knowledge of the efforts expended and the value of the services rendered.'" *Brown*, 838 F.2d at 453 (quoting *United States v. Anglin & Stevenson*, 145 F.2d 622, 630 (10th Cir.1944)). .

■ In the case at bar, when the Court became aware that class counsel could not reach a unanimous stipulation, it necessarily gave substantial deference to Lead Counsel's proposed allocation. *See Manual for Complex Litigation* § 20.22 at 27, (3rd ed.1995); *see also In re Indigo Sec. Litig.*, 995 F.Supp. 233, 234 (D.Mass.1998). In a case of this magnitude, the assistance of Lead Counsel on matters such as this is especially invaluable. Accordingly, this Court, after reviewing the previous submissions of class counsel as to hours and expenses, relying on previous discussions with Lead Counsel as well as other members of class counsel, and weighing the relative responsibilities of class counsel members and their contribution to this litigation, as well as when respective attorneys became involved in this litigation, found Lead Counsel's allocation to be fair and reasonable.

When this Court approved Lead Counsel's allocation, the Court reasoned that Lead Counsel, like the Court as the presiding jurist, was in a unique position to weigh the contributions to the litigation.[7] *See In re Indigo Sec. Litig.*, 995 F.Supp. at 234. And "[a]ny counsel who [was] dissatisfied with the allocation [could] apply to the Court for relief." *Id.* (using the same approach). Following this approach, the Court ran this allocation "up the flagpole" to see the reaction of class counsel. If there were no dissenters, the matter would be closed.

### B. Applicable Law and Procedure Implemented

However, five class counsel members objected to the Court's allocation. To satisfy all concerned, the Court has now reviewed the quality and quantity of class counsels' contributions again. So that counsel understand the Court's thought process in the matter, and to preserve the integrity of the Court's decision today, the Court will now review the applicable law that it has considered.

■ In a matter of this complexity, the Court looked to Alba Conte's treatise on this issue:

To the extent that such a stipulation is not possible in whole or in part, the court must make the allocation. An appropriate formula for the court to allocate an aggregate fee among multiple counsel should give emphasis to the responsibilities properly assumed and the court's observations of each counsel. The value of time expended with appropriate adjustments may provide a rough starting point for assessing the respective roles of counsel, but it should not be used rigidly as a precise measure to the exclusion of other intangible factors.

Conte, *supra* § 2.17 at 71–72.

■ The Court's research reveals that courts unanimously make allocations based "upon the quantity and quality of effort expended by the attorneys in obtaining the common fund." Derfner & Wolf, *supra* ¶ 17.02 at 17–7 & n. 23.

Even today the Court should and must rely, to a degree, on the voice of Lead Counsel on the responsibilities of class counsel members, quality of their work, and novelty of issues involved. It was Lead Counsel who managed the plaintiffs' case. Furthermore, as previously dis-

---

**7.** Lead Counsel explained to the Court informally, and for the record at the December 4, 1998, hearing, the level of detail his firm used in coming to the proposed allocation to the satisfaction of this Court. *See* December 4, 1998, Tr. at 26–57.

cussed, it is well established that Lead Counsel must play an invaluable role on a variety of matters in a complex litigation case such as this. Nevertheless, the Court recognizes that different people will view the same situation differently. To that end, the Court evaluated in earnest the objectors' description of events.

The Court has also put restrictions on the subjective element of its analysis since any fee award must bear some relationship to the effort expended. *See In re "Agent Orange" Product Liability Litig.*, 818 F.2d at 223.

■ To comport with due process considerations, the Court set this matter for hearing so that it could hear individual class counsel members on this important matter. On December 4, 1998, this Court heard all who wanted to speak on this issue to better understand the relative responsibilities and efforts exercised by class counsel members. *See In re Domestic Air Trans. Antitrust Litig.*, 148 F.R.D. at 357 (stating that the court would follow a similar · approach if faced with such a task).

■ Furthermore, the Court has also considered factors set out by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). *See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454–55 (10th Cir. 1988). The Tenth Circuit has adopted these factors for setting and reviewing percentage fee awards in common fund cases. *See id.* at 454. However, the Tenth Circuit has not specifically adopted the *Johnson* factors for the situation at bar: Allocation of a percentage fee award.[8] Yet these factors are relevant to the extent they provide a useful framework for assessing the "quality and quantity" of counsels' work. The *Johnson* factors are as follows:

(1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (8) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 454–55.

■ Bearing these standards in mind, the Court first concluded that the one-on-one procedure carried out by Lead Counsel to arrive at an aggregate award was fair and reasonable. The objectors contend that they needed to know what other attorneys were getting to assess the value of their own efforts.[9] However, the objectors have not persuaded the Court. Each attorney knew the aggregate award amount and knew their respective role in this case. Lead Counsel was faced with an unenviable dilemma, he had to allocate an award where nobody would agree if anybody knew what the other was making. The Court appreciates the fact that getting 19 people to agree on any issue is difficult enough without having $19.5 million at stake. Given this, the only way Lead Counsel could arrive at an agreement was to negotiate one-on-one. This procedure was fair and in the end, wise. The Court has no doubt this was Lead Counsel's best option given the circumstances and commends him for handling his responsibilities as he did. Likewise, there is no evidence

8. This is not surprising considering the dearth of applicable law in this area.

9. It is ironic that the objector's contend that they needed to know what others were making yet in their submissions to the Court they have not proposed how the Court should undertake making an aggregate decision. This strengthens the Court's assessment that each class counsel member was interested only in the amount they were awarded and not in the whole, a factor that surely contributed to inability to compromise.

that Lead Counsel implemented this procedure to "cheat" any firm. As such, the Court rejects such a notion today.

The Court will now explain why the allocation it approved was fair and reasonable. In doing so, the Court will first analyze the three largest fee awards: The awards of Lead Counsel, Mr. Brodhead, and Mr. Suggs. After analyzing these three awards, the Court will address the arguments of the objectors.[10]

### C. Lead Counsel's, Peter Brodhead's and David Sugg's Awards

#### 1. Lead Counsel's Award

The Court finds that the award to Waite, Schneider, Bayless & Chesley Co., L.P.A., was fair and reasonable. As an overview, Mr. Chesley served as Lead Counsel, an enormous undertaking. This firm was involved in this litigation from its infancy. In fact, it was Lead Counsel who initially filed this class action. Lead Counsel's firm logged 6023.5 hours in critical phases of this case. This constitutes 12.78% of the total hours submitted. As will be explained, the Court cannot understate the services of Lead Counsel and his firm in arriving at the favorable result in this case.

Lead Counsel's firm logged 1707.5 hours in the discovery and pretrial phases of this litigation. Another 1560 hours were spent for trial preparation and trial. Finally, 2756 hours were logged in post settlement work.

Lead Counsel's firm played a significant part in obtaining a favorable settlement. Of the 125 depositions taken in this case, Lead Counsel's firm took 35. Indeed, in July 1994 this Court held the first MDL status conference. Within 11 months, under the leadership of Lead Counsel, class counsel succeeded in creating the only na-

tional products liability personal injury class ever certified for trial. After three months of trial, class counsel succeeded in negotiating and securing funding for the $150 million settlement reached.

Further evidence supports finding that Lead Counsel's firm assumed a leadership role that the Court should reward. Lead Counsel played an integral part in organizing the major discovery effort, conducting discovery, and briefing discovery issues. This firm assumed responsibility for the litigation, decided delegation of responsibilities and otherwise assumed a management role in assuring that class counsel properly handled all work. This firm also handled the briefing and arguing for class certification, motions to stay pending the grand jury investigation, and various discovery hurdles. During the 42–day trial, Lead Counsel's firm, along with Mr. Brodhead and Mr. Suggs, presented the testimony and conducted all the cross examination of all witnesses (with the exception of two individual plaintiffs and a treating physician whose testimony was presented by Mr. O'Donnell). Lead Counsel's firm handled all motions in limine and assumed overall responsibility for the trial. Mr. Chesley negotiated the settlement and was an integral part in obtaining approval of the settlement. Furthermore, Lead Counsel's firm has logged almost 3,000 hours in post settlement work. Lead Counsel's firm assumed responsibility for unrepresented plaintiffs in the claims process. The firm responds to daily inquiries from claimants, and assists attorneys concerning Fund IV claims.

The *Johnson* factors also support Lead Counsel's firm's award. Lead Counsel logged half its hours before trial. This is more than any other firm in the critical

---

10. For purposes of this Order, it is not necessary to analyze the awards of the other non-objecting class counsel members in great detail. First, those attorneys/firms have not objected to the fee award. Second, the Court has sampled billing records for these attorneys/firms and has found their records to be substantially accurate. Third, through its

own observations and input from class counsel, this Court understands the role of these class counsel members. And finally, this Court found once again, as it did previously, that those awards were fair and reasonable given the quality and quantity of work done by those attorneys.

phases of this case. The novelty and difficulty of the problems encountered and overcome by this firm were often matters of first impression. Once this case went into pre-trial mode, it is uncontested that this case precluded Mr. Chesley and Ms. Abaray from working on other matters; this case was a full time job. Further, this case went to trial in 18 months and has the distinction of being the only MDL case to ever go to trial. This fact also lends substantial weight to giving Lead Counsel's firm a favorable award because it was under his leadership that class counsel overcame numerous obstacles and was ready for trial on time. The experience and reputation of the lawyers in Lead Counsel's firm are similarly beyond reproach. This firm has a national reputation for being one of the premier complex litigation firms in the country.

One other matter bears emphasizing and applies to all members of the trial team. This case is unique in that it did not settle until after 42 days of trial. Defendant, only after seeing class counsel put on its case, decided to settle this matter. A great deal of credit must go to the trial team and its preparation for accomplishing this feat. As previously discussed, Lead Counsel's firm played a very large role in the trial. It is the Court's opinion that the services of the trial team paid enormous dividends for class members. This is an intangible factor, unique to this case, that this Court has taken into account that cannot be understated.

In sum, when considering both the quality and quantity of work performed by Lead Counsel, $6,985,000 (37.57% of the total award) the allocation is fair and reasonable for Lead Counsel in this landmark case. The award is neither excessive nor arbitrary, the Court approved it only after a careful review.

### B. Peter Brodhead

█ The Court also finds that the award to Peter Brodhead was fair and reasonable. Mr. Brodhead logged a total of 2180.5 hours in this case. Of this time, over 1800 hours was spent on discovery, other pretrial matters, and the trial itself. Mr. Brodhead clearly carried a heavy burden in crucial phases of the litigation. Mr. Brodhead took or defended 23 (of 125) depositions. He helped organize the major discovery effort, conducted significant discovery, and briefed discovery issues. Next to Lead Counsel and Mr. Suggs, Mr. Brodhead logged more hours in the two most important phases of this litigation: Discovery and pretrial work, and trial preparation and trial. Mr. Brodhead also played an integral role in arguing significant motions that were very beneficial to the clients in this case.

Mr. Brodhead, along with Mr. Suggs and Lead Counsel's firm, presented all the testimony and conducted all cross examination of witnesses (again, save for the witnesses examined by Mr. O'Donnell). By his own account, by the spring of 1995 this case became a full-time job for Mr. Brodhead. During this time, he abandoned his normal practice. The Court appreciates what a large sacrifice this was for Mr. Brodhead; he should be rewarded.

Mr. Brodhead's previous award of $2,391,580 in fees constituted approximately 12.86% of the total fee award. Given the point at which Mr. Brodhead logged these hours—early in the litigation through the trial phase—the Court finds that this award is fair and reasonable today. As explained above, the *Johnson* factors of time and labor, novelty and difficulty, preclusion of other employment, amount involved and results obtained, experience (admitted in 1979) and reputation of Mr. Brodhead, as well as undesirability of the case and nature and length of the relationship all support this award. Mr. Brodhead's award will thus remain unchanged.

### 3. David Suggs

█ The award to Mr. Suggs was also fair and reasonable. Mr. Suggs was a major contributor in the pretrial, trial preparation and trial of this case. Mr. Suggs took or defended 13 depositions. He also played an integral role in the

discovery process, including arguing and briefing major pretrial issues. In all Mr. Suggs contributed almost 2000 hours to the pretrial and trial work for this case. His work, in terms of hours was only surpassed by Lead Counsel.

Mr. Suggs was awarded $2,390,167 in fees. This is approximately 12.86% of the aggregate fee award. Again, the Court has based such an award not only on the quantity, but on the quality of Mr. Sugg's efforts. He put in many hours during the critical phases of this trial that, in the Court's opinion, had a significant impact on settling this case. Again, the Court must remember that this case, unlike other MDL cases, settled only after it went to trial and the Court has accorded great weight to trial counsel for this effort.

When one looks at the benefit conferred to the class through this lens, it is apparent that the Johnson factors support Mr. Suggs' award. The time and labor factor and the preclusion of other work factor weighs heavily in favor of Mr. Suggs because of the substantial hours put into this case in the relatively short period to get ready for trial. The novelty and difficulty of the issues involved also weigh in his favor. Of course, the time limitations imposed on Mr. Suggs to get this case ready for trial plus the experience and reputation of Mr. Suggs also favor granting Mr. Suggs a sizable award. In all, from the Court's perspective, Mr. Suggs did an excellent job, and for his major contribution to the class his award must stand.

The Court will now confront the Objectors' arguments.

## D. The Objectors

Before the Court undertakes the objectors' arguments, it must state a policy that pertains to all objectors (and all attorneys' wards for that matter). While each objector, as he should, does not suggest how the Court should decide this matter overall, that is exactly what the Court must do. Necessarily, in a situation such as this where the Court is working with a finite amount of money, when one person gets more, another must get less. Accordingly, when the Court assesses the objectors' arguments why they should get more, it necessarily had to consider why another attorney should get less in an attempt to find where the equitable allocation lay. Although not stated in the remainder of the Court's Order, it was under this premise that it evaluated each award.

### 1. Paul Rheingold

The Court initially awarded Mr. Rheingold a fee of $1,030,000 for 1938.5 hours. Of that 1938.5 hours, Mr. Rheingold billed 606 hours. The remainder of Mr. Rheingold's time was based upon the work of a first-year associate and a paralegal.

Mr. Rheingold first objected to the process used by Mr. Chesley. Specifically, Mr. Rheingold objected to the fact that Lead Counsel negotiated fees on a one-on-one basis. In Mr. Rheingold's opinion, and the opinion of Geoffrey Hazard, Lead Counsel should have negotiated the fees in an open environment where the attorneys could weigh their merit against other fee awards. Given that this Court has independently reviewed the fee allocation, and as previously discussed, the Court finds that the one-on-one process did not offend notions of due process, this objection is now moot and is overruled in any event. Moreover, Mr. Rheingold confessed that this issue was now moot at the December 4, 1998, hearing.

Mr. Rheingold also objected to the fact that Lead Counsel and the Court had not heard him and other counsel on this issue. Again, because this Court held a hearing, this objection is now moot and is overruled.

Mr. Rheingold stated in writing and in open court that Mr. Chesley was cutting side deals with other attorneys, and playing favorites among class counsel members. He has provided absolutely no proof to support this proposition. The Court finds that this objection is without merit and is overruled.

██ Mr. Rheingold wanted this Court to take a hard look at the fee award and make the allocation itself. The Court has done this and has employed the criteria discussed earlier in this Order. However, contrary to Mr. Rheingold's wishes, this Court will not solely employ hard, "objective" criteria to make the fee allocation. As previously discussed, it is this Court's duty to weigh both the quantity and quality of work done. Addressing the quality of a given attorney's effort necessarily requires an element of subjectivity.

██ Finally, Mr. Rheingold generally objects to the amount of his fee award. Mr. Rheingold argues that his firm put in 1938.5 hours (4.11% of the total hours submitted), which is 32% of the time Lead Counsel put in. Thus, he reasons, if the Court has awarded Lead Counsel almost $7 million, his firm should get $2.25 million. However, the matter of fee allocation is not that simple.

The Court first notes that the Court awarded Mr. Rheingold the largest sum of any class counsel member who did not participate in the trial. Although Mr. Rheingold's firm's hours account for 4.11% of the total hours submitted (and Mr. Rheingold's own hours are much less of that total), his award is almost 5.54% of the total award—the largest of any firm that was not trial counsel. The Court has already stressed, and Mr. Rheingold has agreed (in his December 9, 1998, submission to the Court), that the Court should compensate the trial attorneys' time at the highest rate; the Court will not cut those firms' awards to the benefit of Mr. Rheingold.

Mr. Rheingold has made significant contributions to this case and must be rewarded. Mr. Rheingold personally played a significant role in the pre-trial and discovery aspects of the case. By Mr. Rheingold's account, his firm took or defended 11 depositions. Lead Counsel claims that Mr. Rheingold's firm took or defended 8 depositions. By the Court's count, Mr. Rheingold's firm took 10 depositions. The Rheingold firm's lawyers' skill and effec-

tiveness in these depositions are duly noted by the Court and have been taken into account in determining the fairness of the fee award.

██ However, the Court must note that Lead Counsel felt that Mr. Rheingold negatively affected the class with some of his actions. After much thought, the Court must agree. The law is well settled that a court should only credit attorneys in class actions for those hours that yield some tangible benefit to the class. *See, e.g., In re Fine Paper Antitrust Litig.,* 98 F.R.D. 48, 84, 91 (E.D.Pa.1983). While the Court does not necessarily fault Mr. Rheingold for opposing class certification, once the Court certified the class he should have let sleeping dogs lie. However, Mr. Rheingold instead joined Copley in attempting to decertify the class. He also argued for a continuance against the arguments of Lead Counsel. This failure to provide a unified front surely encouraged Copley to push this case to trial before settlement. The Court must consider this fact in determining Mr. Rheingold's award.

When considering all the circumstances, a fee of 5.54% is very reasonable. The *Johnson* factors of time and labor, novelty and difficulty, requisite skill, and experience and reputation all support a large award. Mr. Rheingold deserves the largest award of any non-trial counsel and that is what he initially received. Furthermore, as discussed above, this firm provided significant work in the early part of this case and it provided an associate for part of the trial, but the firm's involvement ended at that point. Even when the Court looks at this firm's fee award in light of the other firm's fees, the justification for the fee previously awarded is stronger, not weaker. In fact, a smaller award might have been in order, but the Court will not disturb its previous allocation.

Therefore, for the stated reasons, Mr. Rheingold's objections are **OVERRULED.**

### 2. Michael O'Donnell

Mr. O'Donnell has objected to his fee award of $750,000. Mr. O'Donnell initially objected on due process grounds. Given the actions of this Court, as previously discussed, any objection on such a ground is now moot and is overruled in any event. Mr. O'Donnell's other objections primarily surround the fact that he was a member of trial counsel and he received by far the lowest fee of any member of trial counsel.

■ Upon close inspection, however, one sees that the $750,000 fee is fair and reasonable. Mr. O'Donnell put in 1261.4 hours in attorney and paralegal time in this litigation. By Mr. O'Donnell's calculations, his firm put in 23 hours for discovery and pre-trial work, 1016.1 for trial preparation and trial, 21 hours for other pre-settlement work, and 220.8 hours for other post-settlement work.

Mr. O'Donnell, however, first became involved in this litigation in late April 1995, only shortly before the trial began. During this short time, he prepared for trial and handled the claims of two clients for Lewis Saul. Getting ready for a case of this complexity surely used all of Mr. O'Donnell's time. The Court commends Mr. O'Donnell for taking on such a monumental task and for the quality lawyering performed during trial.

However, unlike other trial counsel who were significantly involved in the discovery and early phases of this litigation, Mr. O'Donnell was not. He became involved after the Court certified the class and shortly before trial. As such, he did not share the significant risks of other trial counsel who had been involved with this case since its inception. While Mr. O'Donnell's fee is approximately ⅛ of trial counsel Suggs' and Brodhead's, Mr. O'Donnell's fee compares favorably when one sees that the trial time commitment for the other trial firms is approximately only ¼ of their total time submitted. When viewing Mr. O'Donnell's award under this light, $750,000 is a fair and reasonable fee—for approximately 3 ½ months of Mr. O'Donnell's life. Furthermore, $750,000 is approximately 4.03% of the fee award even though Mr. O'Donnell's hours are only 2.97% of the total hours submitted.

The *Johnson* factors also support Mr. O'Donnell's fee. The time and labor involved, the novelty and difficulty of questions, skill, preclusion of other work, time limitations, and experience all weigh in favor of giving Mr. O'Donnell a substantial award. But the length of time Mr. O'Donnell was involved in this case, the point at which he became involved, and nature and length of the professional relationship all weigh in favor of giving Mr. O'Donnell a smaller fee than the other trial counsel.

Having found that Mr. O'Donnell's original allocation is fair and reasonable, his objections must be **OVERRULED**.

### 3. Charles Schmidt

■ Mr. Schmidt has joined the objection filed by Mr. Rheingold. He has not presented any arguments why the Court should award him a larger fee. The Court finds that Mr. Schmidt's objection is without merit. Mr. Schmidt had a very limited role in this case. He did not take any depositions, did not write any briefs, did not attend any of the trial, and was not involved in any post settlement matters. All the hours submitted, 264, were for correspondence, meetings, and other pre-settlement activity. An award of $36,900 is quite generous.

Mr. Schmidt's objections must be **OVERRULED**.

### 4. Lewis Saul

■ Mr. Saul objects to his award of $700,000. Mr. Saul's award of $700,000 is approximately 3.76% of the total fee award. Mr. Saul objects first on due process grounds, but as previously discussed, such an objection is now moot and is overruled in any event. However, Mr. Saul also objects on grounds that he has been involved since this lawsuit was in its infancy and is entitled to just compensation.

Mr. Saul had 2409.60 attorney/paralegal hours. Of this, Mr. Saul's firm billed

1213.2 hours for discovery and pre-trial work, 975.25 hours for trial preparation and trial, 46 hours for other matters, and 175.15 hours for post settlement work. These numbers show that Mr. Saul's firm was involved in the critical aspects of this case.

In fact, Mr. Saul was involved in this case from its infancy. It was he and Lead Counsel who first filed this class action. Mr. Saul's firm assisted in several aspects of discovery, assisted in class certification, was responsible for publishing the class notice, prepared expert reports, contributed to pretrial motions, and sent a junior associate to help at the trial. The Court has no doubt that Mr. Saul's involvement in the early (particularly pre-MDL) phases of this case was substantial. However, after the initial phases, Mr. Saul's involvement significantly diminished.

There has been some controversy surrounding the fact that Mr. Saul delegated his trial responsibilities to Mr. O'Donnell. Mr. Saul contends that he delegated the responsibilities at the request of Lead Counsel so that Mr. O'Donnell would have an important role in the trial. However, the reasons for this delegation are irrelevant. The fact remains that Mr. O'Donnell presented Mr. Saul's clients' cases at trial. Thus, the Court cannot give him credit for being trial counsel.

Further, junior associates and paralegals logged most of the hours billed by his firm (approximately 75%). This leans in favor of giving Mr. Saul a smaller award. This fact, when coupled the fact that Mr. O'Donnell presented his clients' cases at trial, puts Mr. Saul's award in perspective.

Again, the *Johnson* factors also support Mr. Saul's award. The nature of the professional relationship was quite long, Mr. Saul was involved in this case from its infancy. The time and labor involved, because most of the hours were billed by a junior associate, leans toward giving Mr. Saul a smaller award. Mr. Saul graduated from law school in 1990, and while the Court knows he is a fine lawyer, the experience factor of Mr. Saul leans slightly in

favor of giving him a smaller award. Furthermore, Mr. Saul's post-MDL involvement in this case does not appear to involve novel and complex issues of law. In all, the *Johnson* factors lean both ways, but in totality lean toward giving Mr. Saul a smaller award because most Mr. Saul's significant involvement in this case came before it was transferred to this Court by the multi-district litigation panel.

When the Court considers Mr. Saul's contributions, assessing not only the quantity, but the quality of the work, plus the *Johnson* factors, the Court must find that an award of $700,000 is fair and reasonable.

*Mr. Saul's objections must be* **OVERRULED.**

### 5. Donald Edgar

 Mr. Edgar has objected to his fee award of $15,000. He asserts that the Court should award him some amount larger than this that more accurately reflects his efforts in this case. For the reasons that follow, the Court must disagree.

Mr. Edgar handled the deposition of one expert on behalf of the class and assisted in notifying class members of claims deadlines in April 1996. Other than this, there is no credible documentation backing up Mr. Edgar's efforts.

Mr. Edgar did not submit time records to Lead Counsel because his computer apparently "crashed." Mr. Edgar was unable to retrieve his records from this crash until November 27, 1998. Why it took almost (or over) two years to retrieve these records is beyond the Court's imagination.

A review of these records reveals that they contain numerous impossibilities, such as being in two places at once, and billing more hours in a day than is possible. When one views the records Mr. Edgar submitted, it is apparent that they were never retrieved by a computer expert. Instead, it appears that Mr. Edgar has attempted to reconstruct his records so that

he would have some documentation to submit to this Court. The records, in their totality, appear to be haphazard and incredulous at best.

In light of the false representations made to this Court, and the lack of documentation supporting Mr. Edgar's hours, his award is more than fair and reasonable, it is generous.

Mr. Edgar's objections must be **OVERRULED.**

### Conclusion

When the Court agreed to undertake this review on December 4, 1998, the objectors wanted one thing: For this Court to give an honest and objective look at the fees involved. The objectors can take solace in knowing that the Court has fulfilled its promise. It has spent many, many hours reviewing the Copley docket, file, correspondence, and submissions to understand each attorneys' involvement in this case. In the end, the Court concluded that its original allocation was correct and that Lead Counsel correctly assessed the efforts of class counsel members. The Court did not come to this conclusion quickly or easily, but instead only after a thorough and thoughtful review as the presiding jurist in this case.

The Court's November 23, 1998, Amended Award on Attorneys' Fees is hereby **AFFIRMED** in its entirety as it relates to attorneys' fees. All objections are **OVERRULED** and the motions for reconsideration are **DENIED.** The Special Master may issue the fees specified in the November 23, 1998, Order **30 DAYS FROM THE DATE OF THIS ORDER IF NO PARTY HAS FILED A NOTICE OF APPEAL WITH THIS COURT AT SUCH TIME.**