In re: DIET DRUGS (PHENTER-MINE/FENFLURAMINE/DEXFEN-FLURAMINE) PRODUCTS LIABILI-TY LITIGATION

Lois Gooch–Kiel and Linda
L. Marull, Appellants

Ronald R. Benjamin,* Appellant

Fleming & Associates, L.L.P., individually and on behalf of those clients subject to a 6% or 4% attorneys' fee assessment, Appellant

Lopez, Hodes, Restaino, Milman & Skikos, Members of the Plaintiffs' Management Committee and Robinson, Calcagnie & Robinson, Appellants

Carol Bloom, Jerrie Rawls, Norma Jean Norse, and Tammy Staten, and their counsel, The Non–PMC Refund Counsel, Appellants

Nisen & Elliott, Edward T. Joyce & Associates, P.C., Burke & Burke and The Law Offices of Patrick J. Sherlock, Appellants

Randy Hague, Saundra J. Schaad, Nicholas F. Arace, Lisa Lenee Bratton, and their attorney in this matter, Brian S. Riepen, Appellants.

No. 02–4020, 02–4021, 02–4074, 03–2627, 03–2695, 03–2766, 03–4830.

United States Court of Appeals,
Third Circuit.

Argued Oct. 27, 2004.

Filed March 10, 2005.

* Pursuant to Rule 12(a), F.R.A.P.

Bruce A. Finzen, Gary L. Wilson, Stephanie J. Kravetz, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for Appellants Lois Gooch–Kiel and Linda L. Marull.

George M. Fleming, Sylvia Davidow, Rand P. Nolen, Fleming & Associates, LLP, Houston, TX, Mike O'Brien, Mike O'Brien, P.C., Houston, TX, for Appellant Fleming & Associates, LLP.

Ronald R. Benjamin, Law Office of Ronald R. Benjamin, Binghamton, NY, for Appellant Ronald R. Benjamin.

Jonathan Massey (argued), Bethesda, MD, for Appellants Lois Gooch–Kiel, Linda L. Marull, Fleming & Associates, LLP and Ronald Benjamin.

Janet G. Abaray (argued), Beverly H. Pace, Lopez, Hodes, Restaino, Milman & Skikos, Cincinnati, OH, for Appellants Lopez, Hodes, Restaino, Milman & Skikos, and Robinson, Calcagnie & Robinson.

Douglas G. Thompson, Jr. (argued), L. Kendall Satterfield, Tracy D. Rezvani, Finkelstein, Thompson & Loughran, Washington, D.C., for Appellants Carol Bloom, Jerrie Rawls, Norma Jean Norse, and Tammy Staten, and their counsel, the Non–PMC Refund Counsel.

Michael H. Moirano (argued), Nisen & Elliott, Chicago, Illinois, William J. Winning, Cozen & O'Connor, Philadelphia, PA, for Appellants Nisen & Elliott, Edward T. Joyce & Associates, P.C., Burke & Burke and the Law Offices of Patrick J. Sherlock.

Howard J. Bashman (argued), Fort Washington, PA, for Appellants Randy Hague, Saundra J. Schaad, Nicholas F. Arace, Lisa Lenee Bratton, and their attorney in this matter, Brian S. Riepen.

Arnold Levin (argued), Michael D. Fishbein (argued), Fred S. Longer, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Charles R. Parker, John Roberson (argued), Hill & Parker, Houston, TX, John J. Cummings, III, Cummings, Cummings & Dudenhefer, New Orleans, LA, for Appellees Plaintiffs' Management Committee, Class Counsel, Plaintiffs' Counsel and Common Benefit Attorneys.

Peter L. Zimroth, Arnold & Porter, New York, NY, for Appellee American Home Products Corporation (Wyeth Corporation).

Before NYGAARD, AMBRO and GARTH, Circuit Judges.

GARTH, Circuit Judge.

These seven appeals have been filed by counsel to various claimants in the Diet Drugs Product Liability Multidistrict Litigation ("MDL 1203"), charging essentially that the District Court abused its discretion in awarding and allocating an interim award of attorneys' fees. In the alternative, several of the complaining attorneys petition this Court to issue a writ of mandamus reversing the award. Because we conclude that the orders from which the appeals were taken, Pretrial Order Nos. 2622 & 2859, are not final and appealable orders, we will dismiss each of these appeals for want of appellate jurisdiction. We will also deny the Petition because the circumstances do not warrant relief by way of mandamus.

## I.

In November 1999, American Home Products Corporation ("AHP"),[1] which had sold two prescription drugs for the treat-

---

[1]. On March 11, 2002, AHP became known as Wyeth. We will refer to Wyeth throughout this opinion, even though many matters occurred during AHP's stewardship and before Wyeth came into the picture.

ment of obesity, fenfluramine and dexfenfluramine, marketed as "Pondimin" and "Redux," entered into a Nationwide Class Action Settlement Agreement (the "Settlement Agreement") with a coalition of plaintiffs' attorneys. These attorneys represented those individuals, in both MDL 1203 and the coordinated state class actions, who had sought monetary damages and other relief from their purchase and ingestion of the diet drugs.

Comprehensive in its description of the various classes or categories of claimants which it comprised, the Settlement Agreement also made provision for the payment of legal fees. In particular, the Settlement Agreement established two accounts (to be funded by Wyeth)—the Fund A Legal Fee Escrow Account and the Fund B Legal Fee Escrow Account—to provide for an appropriate award of attorneys' fees. Additionally, the District Court ordered a percentage of fees from settlements or other recoveries achieved by opt-out plaintiffs in individual actions to be paid into a separate account—the MDL 1203 Fee & Cost Account—to compensate the Plaintiffs' Management Committee (the "PMC") for its common benefit work in MDL 1203. The District Court's interim award of attorneys' fees ($153,722,911.25) was comprised of funds from all three accounts.[2]

The overarching question presented by four of the seven current appeals[3] is whether the District Court properly sequestered a percentage of funds from individual settlements or recoveries to compensate the PMC in cases where individual plaintiffs and their attorneys did not utilize the PMC's discovery or trial preparation materials and thus received no ostensible benefit from the PMC. These four appeals, consequently, focus only on that portion of the interim fee award drawn from the MDL 1203 Fee & Cost Account. The three remaining appeals[4] raise the ques-

**2.** $40 million was drawn from the Fund A Legal Fee Escrow Account; $40 million from the Fund B Legal Fee Escrow Account; and $80 million from the MDL 1203 Fee & Cost Account. Before the allocation among the various counsel was approved, the District Court deducted $6,277,088.75 from the allocable funds for the Levin, Fishbein, Sedran & Berman firm as pertaining to services performed after June 30, 2001. The deduction reduced the total award of interim fees to $153,722,911.25.

**3.** *Fleming & Associates, L.L.P* (02–4074); *Lois Gooch–Kiel and Linda L. Marull* (02–4020); *Ronald R. Benjamin* (02–4021); and *Randy Hague, et al.* (03–4830). Arising from Pretrial Order No. 2622, these appeals raise three principal challenges to the MDL 1203 Fee & Cost Account assessments. First, they contest the District Court's general finding that the PMC conferred a substantial benefit on all plaintiffs in MDL 1203, regardless of the receipt of tangible benefits. Second, they challenge the District Court's refusal to conduct individualized determinations to consider the existence of special circumstances. Such arguments, whether cast in a constitutional

mold or considered under an abuse-of-discretion standard, may be reduced to an attack on the procedures employed by the District Court in allocating fees from the MDL 1203 Fee & Cost Account. And third, they challenge the $80 million award from the MDL 1203 Fee & Cost Account as unfair and unreasonable. All four appeals have been consolidated by order of this Court.

Inasmuch as the *Hague* appeal was untimely, it raises the additional question whether the District Court abused its discretion in denying counsel's motion for an extension of time pursuant to Fed. R.App. P. 4(a)(5) (no excusable neglect). We address this question later in the opinion.

**4.** *Lopez, Hodes, et al.* (03–2627); *Carol Bloom, et al.* (03–2695); and *Nisen & Elliott, et al.* (03–2766). Essentially, these appeals, which are taken from Pretrial Order No. 2859, argue that the District Court abused its discretion by delegating authority to allocate common benefit fees to a self-interested committee of lead counsel. The appeals, however, raise several additional issues. The *Lopez, Hodes, et al.,* appeal, for instance, argues that the Fee &

tion of whether the District Court fairly allocated the interim fee award among the PMC, Class Counsel and other common benefit attorneys claiming entitlement to share in the award.

A threshold issue here, however, is that of our appellate jurisdiction, for absent jurisdiction we cannot decide the many issues raised before us. *See Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). We are confronted with appeals from an award of attorneys' fees, which, by their interim nature, may lack the necessary elements of finality to properly invoke this Court's appellate jurisdiction. At the outset, therefore, but not before we describe the nature of the interim fee award within the broader context of this litigation, we turn to the resolution of our jurisdiction.

Some of the details of this complex case can be found in the opinions from this Court dealing with issues concerning the Settlement Agreement and its Amendments.[5] However, other facts less relevant to the prior appeals, or cursorily mentioned in prior opinions, assume greater salience here, thus warranting renewed and extended discussion. The relevant, although abbreviated, aspects of this factual history are reproduced here and taken largely from the District Court's descriptions in its three pretrial orders. *See* Pretrial Order Nos. 1415, 2622 and 2859.

## II.

## A.

Between 1995 and 1997, four million people took Pondimin and two million people took Redux. In September 1997, the U.S. Food and Drug Administration ("FDA") issued a press release reporting abnormal echocardiograms in a "higher than expected percentage of" patients taking the drugs. *See* Press Release, FDA, FDA Announces Withdrawal of Fenfluramine and Dexfenfluramine (Fen–Phen) (Sept. 15, 1997). Subsequent studies suggested that the drugs may have been linked to serious cardiopulmonary side effects, including heart-valve regurgitation (the reverse flow of blood through a closed valve of the heart) and primary pulmonary hypertension (a progressive and fatal disease affecting pulmonary circulation).

After the withdrawal of the diet drugs, 18,000 individual suits and 130 class actions were filed in state and federal courts. In December 1997, the federal cases were transferred to the Eastern District of Pennsylvania for consolidated or coordinated pretrial purposes by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. In November 1999, Wyeth entered into the Settlement Agreement with users of the diet drugs in the United States. After conducting fairness proceedings, the District Court in the Eastern District of Pennsylvania certified a settlement class and approved the Settlement

---

Cost Allocation Committee (the "FCAC") failed to employ the factors in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), and thus used improper procedures in allocating the interim award. The *Carol Bloom, et al.,* appeal challenges the District Court's denial of fees for Non–PMC Refund Counsel's prosecution of nationwide class claims for purchase price refunds. It also challenges the District Court's failure to make any incentive award to plaintiffs in the purported class actions for refund claims. The

*Nisen & Elliott, et al.,* appeal argues that the District Court erred in failing to consult with the State Court Judicial Advisory Committee prior to awarding any attorneys' fees, thereby contravening the Settlement Agreement.

**5.** *See, e.g., In re Diet Drugs,* 385 F.3d 386 (3d Cir.2004); *In re Diet Drugs,* 369 F.3d 293 (3d Cir.2004); *In re Diet Drugs,* 282 F.3d 220 (3d Cir.2002).

Agreement. *See* Pretrial Order No. 1415. Appeals of Pretrial Order No. 1415 followed, with Final Judicial Approval, as defined in the Settlement Agreement, occurring in January 2002.

About 50,000 diet drug recipients ultimately exercised their "initial opt-out rights" to resolve their claims independent of the terms of the class settlement. Soon thereafter, Wyeth settled the claims of all but 600 of these "initial opt-outs," including nearly all of the claims that had been pending in the MDL 1203 proceedings as of November 1999.

Two categories of benefits were and are available to all Class Members under the Settlement Agreement. First, Class Members may apply for medical monitoring and refund benefits. These benefits differ depending upon the length of time that a Class Member ingested diet drugs. Second, Class Members who have serious valvular heart disease ("VHD") may apply for "matrix benefits." The value of matrix benefits for Class Members ranges from $7,389 to $1,485,000. Under the Settlement Agreement, a particular Class Member's benefit is calculated based on his or her age at the time of diagnosis of a matrix-level condition and the severity of the condition. Recognizing the progressive nature of VHD, the Settlement Agreement also allows for damage payments to Class Members who develop serious levels of VHD at any time up to December 31, 2015.

Two separate funds were established under the Settlement Agreement to provide the above benefits to Class Members, and the AHP Settlement Trust was created to administer them. Fund A provided compensation for all non-matrix benefits and associated costs available under the Settlement Agreement. Wyeth fully funded Fund A with $1 billion.

Fund B is the continuing source of matrix benefits and associated costs. Wyeth pays into Fund B on an ongoing basis. Ultimately, Wyeth is obligated for a total of $2.55 billion plus accretion in Fund B benefits, minus certain credits to which it is entitled under the Settlement Agreement. We learned at oral argument that the Trustees have determined that all Fund A purposes have been satisfied, resulting in the transfer of the remaining balance of Fund A to Fund B.[6]

## B.

The counsel fees at issue here, totaling $153,722,911.25, were drawn from three separate accounts: the Fund A Legal Fee Escrow Account, the Fund B Legal Fee Escrow Account, and the MDL 1203 Fee & Cost Account. *See* note 2 *supra.* We describe each of these accounts below.

### 1. *Funds A & B Legal Fee Escrow Accounts* (the "settlement funds")

With respect to the monitoring and refund benefits afforded by Fund A, the Settlement Agreement required that Wyeth deposit the sum of $200 million in the Fund A Legal Fee Escrow Account to pay for the services of counsel in creating that fund. To the extent that any balance remains in the escrow account after payment of fees awarded by the court, that balance will be returned to Wyeth. *See* Settlement Agreement at § III.B.3.

Attorneys' fees associated with Fund B (matrix claims) are paid out of the Fund B Legal Fee Escrow Account. Class Counsel have agreed that the amount of such

---

**6.** At oral argument, we also learned that a proposed amendment to the Settlement Agreement may bring an additional $2 billion into the Settlement to respond to an additional 25,000 new claimants. *See* Tr. in Nos. 02–4021, 02–4074, 02–4021 at 39.

fees shall not exceed $229 million, which is 9% of the $2.55 billion present value amount of Fund B. As such, 9% of every matrix compensation benefit awarded to a Class Member is set aside in the Fund B Legal Fee Escrow Account. In the event a Class Member is represented by counsel, the 9% assessment is deducted from the individual attorney's fee.

This cap on the award of common benefit fees in relation to Fund B is consistent with a prior determination by the District Court that it was appropriate to set aside 9% of the amount recovered by plaintiffs in MDL 1203 and coordinated state litigation to pay "common benefit fees." *See* Pretrial Order Nos. 467 & 517. If the court awards less than the 9% assessments in the Fund B Legal Fee Escrow Account, the monies not awarded will be returned to the Class Members or individual attorneys representing Class Members who contributed the 9% set aside. *See* Settlement Agreement at § VIII.E.1.c.

### 2. *MDL 1203 Fee & Cost Account*

Pretrial Order No. 467 established the MDL 1203 Fee & Cost Account. This order provided for the sequestration of 9% of all payments made by the defendant in settlements in any case transferred to MDL 1203, to be paid into the MDL 1203 Fee & Cost Account out of individual attorneys' share of recoveries. *See* Pretrial Order No. 467. The funds so sequestered were and are available to provide reimbursement of costs and payment of attorneys' fees to the PMC and other attorneys who had been authorized by the PMC, pursuant to Pretrial Order No. 16,[7] to perform work for the common benefit of plaintiffs in MDL 1203 and in any coordinated

state-court proceedings. Ultimately, 3,000 federal cases were subject to the 9% set-aside required by Pretrial Order No. 467.

That order, which was extended by Pretrial Order No. 517, was also designed to facilitate state-federal coordination in the diet drugs litigation. Pursuant to those orders, any state action became eligible for state-federal coordination in the event a court with jurisdiction over the state court action entered an order requiring, among other things, the sequestration of a 6% assessment for the MDL 1203 Fee & Cost Account. Moreover, in exchange for access to the PMC's work product and "trial package," nearly 100 separate state attorneys signed coordination agreements, voluntarily stipulating to the 6% set-aside in all of their state cases.

The mere sequestration of the 9% and 6% of settlement or satisfaction proceeds did not guarantee that the PMC would receive the full amount. To the contrary, the District Court stated that only "upon a proper showing" would the common benefit attorneys receive an award of counsel fees and expenses from the MDL 1203 Fee & Cost Account, in such amounts determined by the court in accordance with controlling law. *See* Pretrial Order No. 467 at ¶ 7.[8]

### C.

All counsel who anticipated filing an application for the award of counsel fees and costs were required to submit their time and expense records for examination by a certified public accountant appointed by the District Court to "audit" these records. *See* Pretrial Order Nos. 16, 1164 & 2224. The audit procedure was designed to seg-

---

7. Pretrial Order No. 16 provides, in pertinent part, that "[c]ommon benefit work may be assigned to counsel of record in any state or federal action." *Id.*

8. Pretrial Order No. 467 expressly limits an award of fees to those attorneys who were authorized by the PMC to perform common benefit services. *See id.*

regate potential fee applicants into one of two modes for presentation of their fee requests to the court—either through a "Joint Petition" or through "individual petitions." *See* Pretrial Order Nos.2023 & 2224.[9] Through this process, 106 different law firms submitted applications for fees and expenses for the auditor's review.

All of the Joint Petitioners sought to participate in the award of fees and costs from the proceeds of the Settlement Agreement with Wyeth (*i.e.*, the settlement funds). The 27 firms within the PMC constituency also sought recovery of fees and cost-reimbursements from the MDL 1203 Fee & Cost Account for services provided to the District Court, the federal litigants, and the plaintiffs in the coordinated state litigation during the course of the MDL proceedings.

In Pretrial Order No. 2622, the District Court considered the petitions for counsel fees and costs in connection with the multidistrict litigation and class action settlement. With respect to the settlement funds, the District Court determined that it was "premature to perform a definitive percentage of recovery analysis." It stated:

> In the usual situation the fee is sought at or near the conclusion of litigation where the only other function remaining is to pay out the court-approved settlement dollars to the class members. The court is then in a good position to review the settlement in light of the *Gunter*

factors. In this class action, in contrast, the settlement is still in many respects in its early stages.

\*\*\*\*\*\*\*\*\*

> Many issues regarding interpretation of the Settlement Agreement, the operation and funding of the Trust, and the payment of benefits to Class Members remain to be resolved. The court is still faced with a continual flow of contested motions and hearings on a variety of matters which could affect the value and efficacy of the settlement.

Pretrial Order No. 2622 at 21–22.[10] For these reasons, the District Court determined that it could not make a final fee award from the settlement funds:

> Questions regarding the value of the settlement and the benefits conferred on Class Members clearly remain. *See Gunter*, 223 F.3d at 195 n. 1. Under the circumstances, the court finds that it is not possible to undertake a *Gunter* analysis and make a full fee award from the Fund B Legal Fee Escrow Account at this time.... In addition, the Trust has followed with an emergency motion seeking the suspension of certain Fund A processing deadlines ... Again, with this issue pending, it would be premature to make a final award of counsel fees from the Fund A Legal Fee Escrow Account.

*Id.* at 24.

Nonetheless, given the "herculean effort" of the Joint Petitioners with respect

---

9. The Joint Petition included all fee presentations that conformed to the District Court's orders according to the auditor's determination. The individual petitions were filed by law firms whose time was disallowed by the auditor and thus not included in the Joint Petition.

10. In *Gunter v. Ridgewood Energy Corp.*, 223 F.3d at 195 n. 1, we set forth the relevant factors to be considered in setting a fee award in common fund cases. These factors in-

clude: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Id.* (citations omitted).

to the class settlement, the District Court found that it would be both fair and reasonable to make an "interim fee award" in the amount of $80 million, consisting of $40 million from the Fund A Legal Fee Escrow Account and $40 million from the Fund B Legal Fee Escrow Account. A larger award, the District Court noted, would be "inequitable when so many Class Members are experiencing prolonged delays in the receipt of their benefits." A final award would have to wait until the viability of the Settlement Agreement had been firmly established. The District Court stated:

> When the pressing issues delineated above have been resolved and the entire picture is less clouded, Joint Petitioners and others ruled herein to be entitled to a fee may make further application for additional compensation but no earlier than October 1, 2003. We hope by that point the court will be in a better position to make a final fee award to Class Counsel, after consideration and application of *Gunter*.

*Id.* at 26.

The District Court next addressed the claims of the individual petitioners, who essentially asserted that the work they performed in the Diet Drugs litigation conferred a benefit on the class, thus entitling them to an award from the settlement funds. After reviewing their submissions, with two exceptions, the District Court determined that the individual petitioners were not entitled to any fees.

With respect to the available funds in the MDL 1203 Fee & Cost Account, the District Court awarded attorneys' fees in the aggregate amount of $80 million (approximately 5.13% of the gross recovery in federal cases and 3.42% of the gross recovery in the coordinated state litigation), subject to an appropriate proceeding as to the allocation of that award among the 27 firms eligible to participate therein.[11] The remaining one-third of the 6% and 9% assessments, approximately $47 million, was returned without interest to those attorneys who had deposited the funds into the MDL 1203 Fee & Cost Account. Finally, the District Court directed that $2.5 million remain on reserve in the MDL 1203 Fee & Cost Account as a source for payment of ongoing expenses associated with the administration of MDL 1203. As such, Pretrial Order No. 2622 virtually exhausted the funds contained in the MDL 1203 Fee & Cost Account.[12]

The Joint Petition further suggested that the District Court charge Arnold Levin, Esq. and Michael Fishbein, Esq. of the firm Levin, Fishbein, Sedran & Berman, which was a member of the PMC and lead counsel in the class action, with the task of coordinating and developing an agreed upon allocation. The District Court agreed with the suggestion, with some modification, finding the request consistent with authority for allowing lead counsel to allocate fees. The District Court thus appointed the FCAC, consisting of five of the Joint Petitioners, to make a first attempt at allocating the interim class fee award and the award from the MDL 1203 Fee &

---

11. As previously explained, the total funds to be distributed from the Fund A Legal Fee Escrow Account, the Fund B Legal Fee Escrow Account, and the MDL 1203 Fee & Cost Account were $153,722,911.25. *See* note 2 *supra.*

12. Modifying Pretrial Order 467, the District Court also reduced the set aside to 6% in

federal cases and 4% in state-coordinated cases for future recoveries or settlements. Since that order, we understand from representations made at oral argument that multiple millions of dollars have been deposited into the MDL 1203 Fee & Cost Account. Further distribution from this account will therefore be required.

Cost Account. The District Court also provided for objections, responses and hearings regarding the recommended allocation plan.

## D.

On May 15, 2003, the District Court affirmed, with slight modification, the FCAC's fee allocation plan in Pretrial Order 2859, thereby authorizing the distribution of the interim fee amounts. Directly after the District Court entered its Pretrial Order No. 2859, certain of the appealing attorneys [13] sought an emergency stay pending appeal, which was granted by this Court.[14] Thereafter, the PMC and Class Counsel [15] moved to dismiss the appeals for lack of appellate jurisdiction.[16] Our review is plenary.

## III.

We must briefly address a preliminary issue raised by the *Hague* [17] appeal before proceeding to consider the threshold issue of jurisdiction, which affects all seven appeals.

Attorney Brian S. Riepen represented several diet drug users in state and federal courts. His federal cases, upon being transferred to the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings under MDL 1203, were subject to the 9% assessment for the MDL 1203 Fee & Cost Account. Because Riepen allegedly failed to use or benefit from the PMC's discovery efforts, he objected to the MDL 1203 assessment against the individual settlements in the federal cases.

Between the time of the fee hearing and the issuance of Pretrial Order No. 2622, Riepen moved his office to a different location. Although he notified the District Court by sending a letter to the Clerk's Office, Riepen inadvertently failed to notify the PMC or Liaison Counsel about his change of address. This proved to be critical because one of the court-imposed obligations of the PMC was the service of papers and orders on participating counsel. When the PMC mailed Pretrial Order No. 2622 to participating counsel, it presumably mailed the order to Riepen's old business address.

Pretrial Order No. 2622 issued on October 3, 2002. It was entered on the District Court's docket on October 4, 2002. On Friday, November 1, 2002, Riepen's office received from the Clerk of Court a copy of a notice of appeal from Pretrial Order No. 2622 filed by another counsel participating

---

**13.** Throughout this opinion we refer collectively to all appealing attorneys as "Appellants," as it would be confusing to identify them separately, except in the rare instance such as that presented by the *Hague, et al.,* appeal.

**14.** We learned at oral argument that the emergency stay was vacated and the contested interim fees were distributed to the various attorneys to whom they had been allocated.

**15.** The PMC, Class Counsel, Plaintiffs' Counsel and Common Benefit Attorneys are the appellees in this matter.

**16.** No motions to dismiss for lack of appellate jurisdiction were filed by the PMC and Class

Counsel as to the appeals from Pretrial Order No. 2622: *Lois Gooch–Kiel, et al.* (02–4020); *Fleming & Associates, L.L.P.* (02–4074); *Ronald R. Benjamin* (02–4021); and *Randy Hague, et al.* (03–4830). At oral argument, we inquired as to whether these appeals were also without jurisdiction, and we were informed that these appeals were subject to the same jurisdictional challenge as the other appeals.

**17.** *Randy Hague, Saundra J. Schaad, Nicholas F. Arace, Lisa Lenee Bratton, and their attorney in this matter, Brian S. Riepen* (No. 03–4830).

in MDL 1203.[18] Pursuant to Fed. R.App. P. 4(a), the deadline to file an appeal was Monday, November 4, 2002. On Wednesday, November 6, after the deadline had passed, Riepen claims to have finally learned that Pretrial Order No. 2622 had issued on October 3 and that the appeal deadline had recently passed.

On November 12, 2002, eight days after the time to appeal had expired, Riepen filed an untimely Notice of Appeal and also moved the District Court to extend the time to appeal under Rule 4(a)(5),[19] claiming "excusable neglect." The PMC opposed the motion.

On February 20, 2003, this Court ordered the appeal dismissed for lack of jurisdiction. On November 26, 2003 (more than a year after Riepen's motion was filed), in Pretrial Order No. 3141, the District Court denied Riepen's motion to excuse the untimely appeal. On December 22, 2003, Riepen filed a timely Notice of Appeal from that order, which is a final order for purposes of 28 U.S.C. § 1291. Appellate jurisdiction therefore exists pursuant to § 1291 on the limited issue of the timeliness of Riepen's appeal and the existence of excusable neglect.

We review the District Court's rejection of Riepen's motion for an extension for abuse of discretion. Fed. R.App. P. 4(a)(5) provides that the district court may extend the time to file a notice of appeals if the delinquent party shows excusable neglect or good cause.

■ In *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship.*, 507 U.S. 380, 395–97, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court interpreted the term "excusable neglect," albeit in the context of the bankruptcy rules.[20] Since that time, the determination of whether a party's neglect is excusable has been held to be an equitable determination, in which we are to take into account all the relevant circumstances surrounding a party's failure to file timely.

In *George Harms Const. Co., Inc. v. Chao*, 371 F.3d 156, 163–64 (3d Cir.2004), this Court applied *Pioneer's* four-factor analysis of the excusable neglect standard in a Fed.R.Civ.P. 60(b) context. Other courts of appeals have applied the *Pioneer* excusable neglect standard in other contexts unrelated to bankruptcy. Indeed, the Fifth Circuit and other circuits have applied *Pioneer* in the context of filing for appeal pursuant to Fed. R.App. P. 4(a)(5). *See Halicki v. La. Casino Cruises, Inc.*, 151 F.3d 465, 469 n. 3 (5th Cir.1998) ("In extending *Pioneer* to rule 4(a)(5), we follow each of our sister circuits to have addressed the issue.") (citation omitted); *Advanced Estimating Sys., Inc. v. Riney*, 77 F.3d 1322, 1324–25 (11th Cir.1996) (per curiam); *Fink v. Union Cent. Life Ins. Co.*, 65 F.3d 722, 724 (8th Cir.1995); *Reynolds v. Wagner*, 55 F.3d 1426, 1429 (9th

---

18. Riepen also received another notice of appeal from Pretrial Order No. 2622 on Tuesday, November 5, 2002.

19. Fed. R.App. P. 4(a)(5) provides:
   The district court may extend the time to file a notice of appeal if:
   (i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and
   (ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

20. The Supreme Court set forth four factors to be weighed in determining whether the neglect claimed was excusable: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* at 395, 113 S.Ct. 1489.

Cir.1995); *Virella–Nieves v. Briggs & Stratton Corp.,* 53 F.3d 451, 454 n. 3 (1st Cir.1995); *City of Chanute v. Williams Natural Gas Co.,* 31 F.3d 1041, 1046 (10th Cir.1994) (citations omitted); *Weinstock v. Cleary, Gottlieb, Steen & Hamilton,* 16 F.3d 501, 503 (2d Cir.1994) (citation omitted).

■ We, too, now find no reason to deprive *Hague,* an untimely filer under Rule 4(a)(5), of the standard prescribed by *Pioneer* to test whether the late filing should be excused. The District Court here disposed of Riepen's motion merely by denying it without an opinion, without a reason, and more importantly, without reference to the *Pioneer* four-factor balancing standard. The District Court held, without more, that Riepen's neglect was not excusable.

In doing so, and without articulating reasons as to why Riepen's neglect was not excusable, the District Court did not properly exercise its discretion. Having reviewed the record and the reasons for the delinquent filing, as well as having heard from Riepen's counsel at oral argument, and having measured Riepen's actions by the excusable neglect calculus of *Pioneer,* we are satisfied that Riepen's late filing should be excused. The length of Riepen's delay in filing, in the context in which it occurred, was minimal; it had no potential impact on the judicial proceedings; the circumstances surrounding Riepen's failure to obtain notice of the entry of Pretrial Order No. 2622 were understandable and reasonable; and most important of all— there was no danger that Riepen's late filing could prejudice the Diet Drugs proceedings.

Under all the circumstances, therefore, we will allow Riepen's appeal. In doing so, however, we hasten to add that the appeal—*Hague, et al.*—suffers from the same jurisdictional problems as the other six appeals, which we discuss *infra.* Hence, we cannot review *Hague'*s arguments on the merits, just as we are foreclosed from reviewing the issues raised in the other appeals.

## IV.

### A.

Courts of Appeals acquire jurisdiction over appeals through final orders under 28 U.S.C. § 1291; collateral orders under the doctrine of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); interlocutory orders concerning injunctions under 28 U.S.C. § 1292(a); questions certified for appeal by the district court and then certified by the appellate court under 28 U.S.C. § 1292(b); or certification by the district court pursuant to Fed.R.Civ.P. 54(b) of a "final" judgment when disposition has been had of less than all parts or issues in a given case.[21]

We are not here concerned with the jurisdictional routes provided by § 1292 or

---

**21.** Although one of these appeals (*Lopez, Hodes, et al.* (03–2627)) seeks a writ of prohibition/mandamus, we need not devote time to that suggestion. Mandamus, which is original process in this court, is only available in extraordinary circumstances, *see In re Federal–Mogul Global, Inc.,* 300 F.3d 368, 379 (3d Cir.2002); when it is not utilized as a substitute for appeal, *see In re Sch. Asbestos Litig.,* 977 F.2d 764, 772 (3d Cir.1992) (quoting *Westinghouse Elec. Corp. v. Republic of Philip-* *pines,* 951 F.2d 1414, 1422 (3d Cir.1991)); and even when the right to the writ is clear and indisputable, the exercise of our power is largely discretionary, *see Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 163 (3d Cir. 1993) (quoting *Will v. United States,* 389 U.S. 90, 96, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)) (citation omitted). Nothing presented by the Appellants here informs the exercise of our discretion or warrants the issuance of a writ.

Fed.R.Civ.P. 54(b), inasmuch as certification was neither sought nor granted by the District Court and the appeals filed here do not involve the denial, modification or grant of injunctive relief. The Appellants essentially rely on "finality" pursuant to § 1291 (*see* discussion, *infra*, at part IV.C.) and the collateral order doctrine (*see* discussion, *infra*, at part IV.D.) as sources of appellate jurisdiction. We hold that their reliance is misplaced.

### B.

Before we begin our jurisdictional analysis, it is helpful if we extract from the foregoing history those facts providing the relevant context that gives rise to our holding that appellate jurisdiction to review Appellants' arguments does not exist at this time. We summarize some of the relevant circumstances:

(1) Three different funds are involved: the Fund A Legal Fee Escrow Account, the Fund B Legal Fee Escrow Account, and the MDL 1203 Fee & Cost Account.

(2) In making the fee award and allocation, all three funds were intermingled.

(3) There are millions of dollars remaining to be distributed from the Fund A Legal Fee Escrow Account and Fund B Legal Fee Escrow Account.

(4) The MDL 1203 Fee & Cost Account has had more than $25 million in additional assessments since the June 30, 2001 allocation.

(5) More than 25,000 new opt-out cases are now pending as part of MDL 1203.

(6) It is estimated that $60 million will be added to the MDL 1203 Fee & Cost Account.

(7) The Settlement itself has been amended and is subject to further amendment, which may bring $2 billion additional into the Settlement.

(8) The District Court itself found that it could not make a final award, stating that "... the Settlement is still in many respects in its early stages ... There is a significant amount of work still to be done by the Joint Petitioners." Pretrial Order No. 2622 at 24–25.

(9) The District Court deliberately did not perform a *Gunter* analysis (*see* note 10 *supra*) because there were many issues regarding the Settlement Agreement and the funds to be resolved. It postponed its *Gunter* analysis until the final distribution.

It is with these facts in mind that we consider our jurisdiction.

We have been advised of no authority that holds that orders—such as Pretrial Order Nos. 2622 & 2859—issued in the same case can be deemed final just because one order may lead to the exhaustion of one of three funds. At oral argument, we analogized to a situation where the plaintiff in an automobile accident brought suit against the driver and the owner of the vehicle. The owner was granted summary judgment, but the driver was required to stand trial. Counsel here agreed that the plaintiff could not appeal the owner's summary judgment by claiming that the summary judgment was a "final" order. Counsel further agreed that in such a situation the plaintiff would be obliged to withhold any appeal until the case against the driver had been determined by the jury. At that time, and at that time only, finality would have attached to the entire case, and the plaintiff could then appeal from the summary judgment in favor of the owner.

Similarly, here we have one case—the Diet Drugs Product Liability Multidistrict Litigation. Two orders (Pretrial Order Nos. 2622 & 2859) have been entered among many other orders in that case. The appeals have been taken from those two orders. The Appellants claim that

because one of the funds to which the orders apply (the MDL 1203 Fee & Cost Account) has been almost exhausted, that we should regard that fund as being a "final" judgment sufficient to invoke our jurisdiction.

The problem with their contention is that the existence of the two other funds (the Fund A and B Legal Fee Escrow Accounts), neither of which have been exhausted, and the monies from which are intermingled with the monies from the MDL 1203 Fee & Cost Account in the interim fee award, prevent finality from attaching. There can be no such thing as "partial jurisdiction" or "partial finality." In this case, the entire $153 million interim fee that was allocated stemmed from all three funds and we know of no authority that allows us to divide the $153 million into three parts, granting jurisdiction to one part and denying it to the other parts. Nor has counsel advised or informed us of such a doctrine.[22]

Indeed, it is clear to us that appeals taken from one of the three intermingled funds and from two among many pretrial orders, all of which originated from just one case, constitute paradigmatic non-final appeals: appeals which do not satisfy our jurisdiction.

## C.

The difficulty with the Appellants' theories is that they not only run counter to

the District Court's intent and actions, but they also fail to recognize that the MDL 1203 fund, even if assumed to be a "final" distribution, was but one part of the funds distributed. Funds A and B still retained the greater portion of the monies that funded them.

A decision of the district court is "final" if it "ends litigation upon the merits and leaves nothing for [the] court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). Accordingly, then, an interim award of attorneys' fees is not, in almost all cases, an appealable final order because it foresees further and additional action by the district court, thus continuing, but not concluding, the fee litigation. *See Yakowicz v. Commonwealth of Pennsylvania,* 683 F.2d 778, 782 (3d Cir.1982) (holding that an order denying interim attorney's fees is not a final order); *see also In re Firstmark Corp.,* 46 F.3d 653, 657 (7th Cir.1995) ("[A]n award of interim fees does not conclusively determine the total compensation due to counsel, so such decisions are generally not considered final."); *Shipes v. Trinity Indus., Inc.,* 883 F.2d 339, 341 (5th Cir.1989) (holding that awards or denials of interim fees are not "final" within the meaning of 28 U.S.C. § 1291); *Rosenfeld v. United States,* 859 F.2d 717, 720 (9th Cir.1988) (interim fee

22. No counsel had considered such an analysis, which we asked about at oral argument. We therefore authorized supplemental briefing and directed that this jurisdictional analysis be addressed. We had advanced this theory because it seemed evident to us that taking an appeal from just one fund out of three—and from fewer than all orders and a judgment generated from this one case—required a Fed.R.Civ.P. 54(b) certification by the District Court. This is not to say that such a certification would be effective. *See Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521

F.2d 360, 364, 366 (3d Cir.1975) (holding that district court must undertake "factor-balancing analysis" and must articulate factors relied upon in granting certification).

The memoranda we received did not advance the Appellants' cause. We learned nothing that persuaded us that the Appellants could appeal from these funds and orders. And because, as we discuss hereafter, neither the "finality" nor the collateral order doctrines urged upon us give us jurisdiction, we are compelled to dismiss all seven appeals.

award not appealable where "district court explicitly provided for revision of the amount at the conclusion of the litigation"); *Hastings v. Maine–Endwell Cent. Sch. Dist.*, 676 F.2d 893, 896 (2d Cir.1982) (holding that order for interim attorney's fees not appealable under § 1291); *Ruiz v. Estelle*, 609 F.2d 118, 118 (5th Cir.1980) (same).

■ Appellants urge, however, that the fee award determined by the District Court possesses the necessary elements of finality to constitute a final, appealable order for purposes of 28 U.S.C. § 1291. In Appellants' view, there was nothing tentative about the fee award, which they claim differentiates this case from those cases holding that interim fee awards are non-appealable. The signal characteristic of a non-appealable interim award, they argue, is the partial compensation paid to counsel "amidst ongoing litigation" such that the determination of the ultimate amount of the award becomes entwined with a consideration of the merits. Here, by contrast, they claim the merits of the underlying litigation is now complete because the District Court has approved the class action settlement, leaving only ministerial or administrative tasks associated with the implementation of the settlement to be completed. Properly understood, then, they argue that this case involves an advance or partial payment of a finite fee award, not an "interim" award of unquantifiable total fees.

In so arguing, however, Appellants mistakenly assume that the total fee award has been firmly established by the District Court. As we have recognized, the counsel fees here were drawn from three separate funds: the Fund A Legal Fee Escrow Account, the Fund B Legal Fee Escrow Account, and the MDL 1203 Fee & Cost Account. While it can be argued, and Appellants so contend, that the distribution of fees from the MDL 1203 Fee & Cost Account is final, thus comporting with Appellants' view of the fee award, the distributions from the Fund A Legal Fee Escrow Account and the Fund B Legal Fee Escrow Account are far from being exhausted, and are neither finite nor final.[23]

Because questions regarding the value of the settlement and the benefits conferred on Class Members remain unsettled, the District Court found that it could not undertake a *Gunter* analysis and make a full fee award from either the Fund A Legal Fee Escrow Account or the Fund B Legal Fee Escrow Account. *See* Pretrial Order. No. 2622 at 24. Only after the remaining issues, affecting the overall value and efficacy of the settlement, have been resolved will the District Court be in a position to consider making a final fee award to Class Counsel. In other words, the total fee award relates to the overall settlement value, which is undetermined at this time. While the maximum possible fees from both accounts equal $429 million ($200 million from the Fund A Legal Fee Escrow Account and $229 million from the Fund B Legal Fee Escrow Account), the District Court awarded only $40 million from each account, leaving very substantial sums of money for future distribution.[24]

---

**23.** We were informed at oral argument, as we have stated, *supra*, in note 12, that since the date of the fee allocation (June 30, 2001) multiple millions of dollars have been deposited in the MDL 1203 Fee & Cost Account.

**24.** Although the Appellants contend that any future award of attorneys' fees will cover only prospective and therefore separate services to be performed, the District Court's opinions in Pretrial Order Nos. 2622 and 2859 make it clear that the future adjustments (if any) to the interim fee allocation will include services that have been performed as well as those to be performed in the future. Thus, cases such

Finally, and in a somewhat similar vein, certain of the Appellants argue that the pretrial orders were final as to them, either with respect to the assessments for the MDL 1203 Fee & Cost Account or their share (or lack thereof) in both the interim and future fee awards, even if the total compensation due to all counsel has yet to be determined. Normally, under Fed.R.Civ.P. 54(b), any order that disposes of "fewer than all of the claims or the rights and liabilities of fewer than all the parties" is not a final, appealable order unless reasoned and certified as such by the district court. Fed.R.Civ.P. 54(b).[25] Here, as we have stated earlier, there is no dispute that the Appellants neither sought nor obtained a Rule 54(b) certification. As a result, the pretrial orders cannot be considered "final" with respect to specific fee claims.[26] *See Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702 (3d Cir. 1988) ("Without this certification, a district court order will not be considered final."); *Yakowicz*, 683 F.2d at 782 n. 8 ("[Appellant] does not-correctly, in our view-contend that the district court's order is appealable under any provision of 28 U.S.C. § 1292. The district court did not deny injunctive relief, nor was certification either sought or granted under either § 1292(b) or Fed.R.Civ.P. 54(b).").

Accordingly, we reaffirm our holding that Pretrial Order Nos. 2622 and 2859 are not final, appealable orders under 28 U.S.C. § 1291.

### D.

The collateral order doctrine, as first annunciated in *Cohen v. Beneficial Indus. Loan Corp.*, "relaxes the strict standard of finality by permitting [the court] to entertain appeals from certain orders that would not otherwise be appealable final decisions." *Martin v. Brown*, 63 F.3d 1252, 1258 (3d Cir.1995) (citations omitted). The order sought to be appealed must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). We have described these three requirements as (1) the "conclusiveness"

as *Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994), and *Finnegan v. Dir., Office of Workers' Comp. Programs*, 69 F.3d 1039 (9th Cir.1995) are inapposite, and Appellants' reliance upon them is misplaced.

**25.** Fed.R.Civ.P. 54(b) states:

When more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. *See also Allis–Chalmers Corp.*, 521 F.2d at 364 (holding that district court must clearly articulate reasons and factors prompting its decision to grant a 54(b) certification).

**26.** Appellants, citing to *Hall v. Wilkerson*, 926 F.2d 311, 314 (3d Cir.1991), argue that a Rule 54(b) certification is not required here because their cases have been finally resolved notwithstanding the pendency of other cases in MDL 1203. We find *Hall* to be inapposite because the consolidation effected there was vastly different from the consolidation of cases for MDL 1203 purposes. Moreover, the interim nature of the orders entered here, when considered with the MDL consolidation, preclude any concept of the "finality" held by us in *Hall*.

prong, (2) the "importance/separateness" prong, and (3) the "unreviewability" prong. *Martin*, 63 F.3d at 1259 (citing *Praxis Props., Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49, 54–58 (3d Cir.1991)). Failure to satisfy any one prong defeats collateral order jurisdiction. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 276, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

Applying the *Cohen* factors here, it is evident that Pretrial Order Nos. 2622 and 2859 do not qualify as collateral orders, for each fails to satisfy both the "conclusiveness" and "unreviewability" prongs.

### 1. The "Conclusiveness" Prong

■ An order is conclusive when no further consideration is contemplated by the district court, which excludes from review any decision which is tentative, informal or incomplete. *Martin*, 63 F.3d at 1259 (internal citations and quotations omitted). Analyzing the first *Cohen* criteria, we cannot conclude that the pretrial orders conclusively determined the question of attorneys' fees. To the contrary, the District Court has expressed unequivocally that it intends to revisit the issue and make a final award after applying the *Gunter* factors. The fee award leaves unresolved the *total* or *final* amount of fees due to Class Counsel. *See Rosenfeld*, 859 F.2d at 720 (order awarding interim fees inconclusive because it did not determine total amount of fees due to counsel); *Hastings*, 676 F.2d at 896 (interim fee award not appealable collateral order because it does not determine claim for attorneys' fees with finality).

To date, only interim fees have been awarded, even taking into account the funds distributed from the MDL 1203 Fee & Cost Account, which represent less than 20% of the total amount of attorneys' fees potentially available under the Settlement Agreement. As the Appellee concludes in its supplemental brief:

> [w]here an interim award does not determine the total amount of fees due to an attorney, contemplates an additional award relating to the same services based on subsequent events, or engenders a genuine prospect of revision by subsequent order, it does not finally resolve the fee question and does not satisfy the conclusiveness prerequisite to collateral order appellate review.

Levin Fishbein Supp. Br. at 4 (citations omitted).

### 2. The "Unreviewability" Prong

■ On the unreviewability prong of the *Cohen* requirements, we consider whether the District Court's orders will be "effectively unreviewable" absent immediate review. *Martin*, 63 F.3d at 1261. To meet this requirement, an order must be such that review postponed will, in effect, be review denied. *Id.* For purposes of the collateral order doctrine, unreviewability means that failure to review immediately may well cause significant harm. *Id.*

■ It is well established that an award of interim fees may be effectively reviewed after final judgment is entered. *See Shipes*, 883 F.2d at 344; *Yakowicz*, 683 F.2d at 784–85; *Hastings*, 676 F.2d at 896; *Ruiz*, 609 F.2d at 119. The one possible exception to this conclusion, as suggested in *Palmer v. City of Chicago*, 806 F.2d 1316, 1319–20 (7th Cir.1986), is when the mere payment of fees would make them unrecoverable. That is, to satisfy the "unreviewability" prong, there must be a showing that disbursement of the fees might very well make them unrecoverable at the end of the litigation should they turn out to have been awarded in error. Appellants have made no such showing here.

Appellants cite to *Palmer* to support their argument that the interim fee award is collaterally appealable under *Cohen* because of the irreparable harm that may be inflicted by an order to pay interim fees. 806 F.2d at 1318 (collateral orders appealable "only when they threaten irreparable harm"). In *Palmer*, a district court ordered a city to pay immediately interim fees that might not have been recoverable if the award was later held invalid. The Seventh Circuit held that the order threatened sufficient harm to justify appellate review. *Palmer*, however, does not support Appellants' position here.

As explained by the Ninth Circuit in *Rosenfeld*, "the 'irrevocable harm' in *Palmer* would arise because interim fees were to be paid directly to a 'revolving fund' of prisoners and defendants whose class members might, by the close of the litigation, be insolvent, have disappeared, or no longer even be parties, making recovery upon appeal impossible." 859 F.2d at 721 (citing *Palmer*, 806 F.2d at 1319). In contrast, the *Palmer* court stated,

> If (but for this appeal) the fees would have been disbursed to the lawyers rather than retained by the prisoners and defendants, the problem would be less serious . . . [w]e assume that the district court has an inherent power to order attorneys to whom fees were paid over by their clients pursuant to court order to repay the fees should the order be reversed.

*Palmer*, 806 F.2d at 1319.

*Rosenfeld* distinguished *Palmer* on the basis that the interim fees were paid directly to counsel, thus satisfying *Palmer's* concern. 859 F.2d at 721. In this case, too, the interim fees will go directly to counsel and the threat of insolvency is entirely conjectural.

Finally, Appellants argue that there will be no finality to the fee adjudication process until the administration of the class settlement is complete, eleven or twelve years from now. The reason the settlement administration will protract over eleven years is that it is designed to provide compensation to those Class Members whose underlying diet drug related disease progresses in severity over time. *See* Pretrial Order No. 1415. But, as Appellees point out, the District Court's decision to refrain from fully adjudicating the request for payment of common benefit fees had nothing to do with concerns arising from the administration of disease progression claims. Rather, it had to do with more immediate concerns about the ongoing viability of the settlement and its consequent value to Class Members. *See* Pretrial Order No. 2622 at 24–26.

Indeed, the District Court initially stated that it would entertain renewed petitions for a final fee award in October 2003. *Id.* at 25. Subsequently, in its allocation decision, the District Court modified this directive, stating that additional petitions should not be filed until further order of the court because "[t]he timing of further petitions for fees will need to be discussed with counsel." Pretrial Order No. 2859 at 36. Nothing indicates, however, that the District Court has changed its expressed intention that "when the pressing issues [described] above have been resolved and the entire picture is less clouded . . . the court will be in a better position to make final fee award to Class Counsel, after consideration and application of *Gunter*." Pretrial Order No. 2622 at 25–26.

At least two of the three *Cohen* criteria have not been met in this case. Accordingly, we hold that the appeals taken from Pretrial Order Nos. 2622 and 2859 cannot be entertained under the collateral order doctrine of *Cohen*.

## V.

We have examined the grounds of jurisdiction advanced by the Appellants, and we have explored with them our own jurisdictional analysis. We have concluded that there is no theory of jurisdiction that permits us to entertain any of the merits arguments or issues presented by the seven Appellants.[27] We have been instructed that absent jurisdiction, we are to dismiss the appeals filed and take no further action. *See Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) ("If the appellate court finds that the order from which a party seeks to appeal does not fall within [its appellate jurisdiction], its inquiry is over.").

We do so here.[28]

AMBRO, Circuit Judge, concurring.

I join wholeheartedly Judge Garth's conclusion that the *Hague* appeal should be allowed notwithstanding its untimely filing. I also agree that each of these appeals must be dismissed for want of appellate jurisdiction and that the circumstances do not warrant relief by way of mandamus. I write separately, however, to highlight certain considerations, though not present here, that I believe would have permitted appellate review. Moreover, because the majority opinion by necessity stops at the

jurisdictional gate, the District Court lacks our Court's comment on the fee award issues. I thus write as but one voice that risks regard as simply a pundit without portfolio.

### I. Rule 54(b) Certification

As a threshold matter and as Judge Garth emphasizes, we must be satisfied that we have jurisdiction to hear these appeals. *Metro Transp. Co. v. N. Star Reinsurance Co.,* 912 F.2d 672, 676 (3d Cir.1990). "This Court's appellate jurisdiction is conferred and limited by Congress's grant of authority." *Berckeley Inv. Grp. Ltd. v. Colkitt,* 259 F.3d 135, 139 (3d Cir.2001) (citing *Sheldon v. Sill,* 49 U.S. 441, 449, 8 How. 441, 12 L.Ed. 1147 (1850)). Under 28 U.S.C. § 1291, our jurisdiction is limited to "final decisions" of the district courts. Here we are dealing with an award and allocation of counsel fees, embodied in Pretrial Orders Nos. 2622 and 2859, that the District Court designated as "interim." We have held that a denial of an interim award of attorneys' fees is not final within the meaning of § 1291. *Yakowicz v. Commonwealth of Pennsylvania,* 683 F.2d 778, 782 (3d Cir. 1982). *Accord, e.g., Shipes v. Trinity Indus., Inc.,* 883 F.2d 339, 341 (5th Cir.1989).

Although an order that disposes of "fewer than all of the claims or the rights and

---

**27.** The Appellee has filed motions to dismiss the appeals in 03–2627, 03–2695, and 03–2766. No motion has been filed to dismiss the other four appeals. As stated in note 16, *supra,* at oral argument the latter four appeals were included within the motions to dismiss, all based on the same jurisdictional grounds. By this decision dismissing all seven appeals for lack of appellate jurisdiction, we have thereby granted all motions to dismiss.

**28.** We have read Judge Ambro's thoughtful concurrence, but we make no comment with respect to it nor do we subscribe to its discussion or analysis, inasmuch as the Supreme

Court has forcefully decreed that once a court determines that it has no jurisdiction, as we have done here, it is not permitted to do anything further. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 440–41, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) ("The Court of Appeals lacked jurisdiction to entertain respondent's appeal and should not have reached the merits.... We accordingly do not address the additional issues on which we granted certiorari, and we do not intimate any view on the merits of the District Court's [ ] decision.") (citing *Risjord,* 449 U.S. at 379, 101 S.Ct. 669).

liability of fewer than all the parties" is normally not appealable, an exception to the general rule exists when an order is certified as appealable by a district court pursuant to Federal Rule of Civil Procedure 54(b).[29] That is, Rule 54(b) "permit[s] the district court to separate out final decisions from non-final decisions in multiple party and/or multiple claim litigation" in order to allow immediate appeal. *Weiss v. York Hosp.*, 745 F.2d 786, 802 (3d Cir.1984); *see also Allis–Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360, 363 (3d Cir.1975) (explaining that Rule 54(b) "attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties"); *Bendix Aviation Corp. v. Glass*, 195 F.2d 267, 269 (3d Cir. 1952) (explaining that "in a multiple claims case the judgment which finally adjudicates all the claims is the only judgment having finality unless [the district] court in its discretion enters a final judgment pursuant to [Rule 54(b) ]").

As Judge Garth points out, in this case no party sought the District Court's certification and therefore this avenue cannot provide a basis for our jurisdiction. Nevertheless, the issue of Rule 54(b) certification deserves further discussion in the context of our case. While Judge Garth's statement that the appeals "charg[e] essentially that the district court abused its discretion in awarding and allocating an interim award of attorneys' fees" is accurate, what is potentially at stake is both far-reaching and nuanced in the context of this case—an appropriate allocation of compensation to counsel in a cutting-edge class action. Not only is the Nationwide Class Action Settlement Agreement (the "Settlement Agreement") of record-setting scale and scope, but it also contains numerous innovative features that have potential significance for future class actions. *See generally* Richard A. Nagareda, *Autonomy, Peace, and 'Put' Options in the Mass Tort Class Action*, 115 HARV. L.REV. 747 (2002). Additionally, under the Settlement Agreement, payments can be made to class members who develop serious levels of valvular heart disease at any time for years to come, specifically until December 31, 2015. While it does not appear that the District Court intends to wait that long before entering a final fee award, it remains useful to explore considerations that would allow for appellate review in complex class action litigation in order to work around requirements that might lead to substantial delay.

**A.**

A district court's Rule 54(b) certification is necessarily predicated on its affirmative answer to two questions: is the judgment final and is it ready for appeal. *Gerardi v. Pelullo*, 16 F.3d 1363, 1368 (3d Cir.1994). Thus, in certifying an order for appeal under Rule 54(b), a court must first decide whether it is dealing with a determination that is final for purposes of certification. *Curtiss–Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). "Finality is defined by the requirements of 28 U.S.C. § 1291, which are generally described as 'ending the litigation on the merits and leaving nothing for the court to do but execute the judg-

---

**29.** The Rule provides in part:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

ment.'" *Gerardi*, 16 F.3d at 1369 (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 275, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945))). Rule 54(b) does not alter this definition, but allows a judgment to be entered if the order has the requisite degree of finality as to a specific claim in a multi-claim action or a specific party in a multi-party action. *Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1153–54 (3d Cir.1990). "Although a district court has discretion in certifying a judgment for appeal under Rule 54(b), the district court cannot, in its exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of [28 U.S.C.] § 1291." *Waldorf v. Shuta*, 142 F.3d 601, 611 (3d Cir.1998) (quotation omitted). While the Rule "allows immediate appeal of separate disputes comprised within a larger litigation[,] . . . [i]t does not, however, allow appeal . . . when the district court will revisit the issues." *Trs. of Chicago Truck Drivers v. Cent. Trans., Inc.*, 935 F.2d 114, 116 (7th Cir.1991).

It appears that four of the appeals before us would be sufficiently final for purposes of the Rule. The appeals in *Benjamin*,[30] *Fleming*,[31] *Gooch–Kiel*,[32] and *Hague*[33] challenge the MDL 1203 Fee & Cost Account assessments—assessments that funded, in part, the interim award of counsel fees. Under Pretrial Order No. 467, a percentage of all payments made by the defendant in settlements in cases transferred to MDL 1203 was to be paid into the MDL 1203 Fee & Cost Account out of individual attorneys' share of their clients' recoveries. In addition, under Pretrial Order No. 517, state actions could become eligible for state-federal coordination provided that, among other things, an assessment would be sequestered for the MDL 1203 Fee & Cost Account. Initially, the percentage for the assessments in federal actions was set at 9% and the state-coordinated action was set at 6%; these percentages were later reduced to 6% and 4%, respectively, in Pretrial Order No. 2622. The difference was refunded to counsel who had paid the higher assessments, leaving the MDL 1203 Fee & Cost Account nearly spent. The sequestered funds have been paid out to counsel in connection with attorneys' fees awarded in Pretrial Order No. 2622 and allocated among counsel as specified in Pretrial Order No. 2859.

The *Benjamin*, *Fleming*, *Gooch–Kiel*, and *Hague* Appellants are contesting the District Court's allocation of funds that have been paid out to the recipients of the attorneys' fee award. It appears that these Appellants are no longer involved in the MDL proceedings. If so, and if they had requested certification under Rule 54(b), the assessments levied against the *Benjamin*, *Fleming*, *Gooch–Kiel*, and *Hague* Appellants appear to be sufficiently final to permit that certification.[34]

---

**30.** *Ronald R. Benjamin* (02–4021).

**31.** *Fleming & Associates, L.L.P* (02–4074).

**32.** *Lois Gooch–Kiel and Linda L. Marull* (02–4020).

**33.** *Randy Hague, et al.* (03–4830).

**34.** The other appeals—*Carol Bloom, et al.* (No. 03–2695) (*"Bloom"*); *Lopez, Hodes, Restaino, Milman & Skikos, et al.* (No. 03–2627) (*"Lopez–Hodes"*); and *Nisen & Elliott, et al.* (No. 03–2866) (*"Nisen & Elliot"*)—present different considerations, as they challenge awards of counsel fees that the District Court expressly indicated were subject to future revision following the application of the factors outlined in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir.2000). *See* Pretrial Order No. 2622 at 24–26.

## B.

Once having found finality, a district court must then determine whether the judgment is ready for appeal, or put differently, whether there is any just reason for delay. *Curtiss–Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). The decision to certify a final judgment under Rule 54(b) is committed to the discretion of the district court, taking into account the interest of sound judicial administration as well as the equities of the case. *Id.; Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

In our Circuit, *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360 (3d Cir.1975), instructs district courts to consider the following factors in deciding whether to grant Rule 54(b) certification: (1) the relationship between the adjudicated and non-adjudicated claims; (2) the possibility that the need for review might be mooted by future developments; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim that could result in set-off against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of the trial, frivolity of competing claims, expense and the like. *Id.* at 363. "[D]epending upon the facts of the particular case, all or some of the above factors may bear upon the trial court's discretion in certifying a judgment as final under Rule 54(b)." *Waldorf v. Shuta,* 142 F.3d 601, 609 (3d Cir. 1998)

Here, the first factor—the relationship between the adjudicated and non-adjudicated claims—favors certification because the parties' claims on the merits have been resolved by settlement. Similarly, looking ahead to the fourth factor, the absence of any pending counterclaim also favors certification.

The second factor—the possibility that the need for review might be mooted by future developments—is less clear-cut. That is, more than $25 million in additional assessments have been deposited into the MDL 1203 Fee & Cost Account since the entry of Pretrial Order No. 2622, and it is estimated that $60 million will be added to that account. Additionally, in Pretrial Order No. 2622, the District Court declined to perform a *Gunter* analysis until certain issues surrounding of the Settlement Agreement are resolved. *See* Pretrial Order No. 2622 at 24–26 (explaining that "[q]uestions regarding the value of the settlement ... clearly remain" and that the court "will be in a better position to make a final fee award to Class Counsel" after the resolution of "pressing issues" surrounding the administration of the Settlement Agreement). At the time such a final award is made, additional funds may be distributed from the MDL 1203 Fee & Cost Account to counsel that performed work for the benefit of the class. It is also possible that some funds will be returned to the attorneys who have been assessed a percentage of their recoveries.

Nevertheless, the fact that additional funds have been deposited into the MDL 1203 Fee & Cost Account since the entry of Pretrial Order No. 2622 does not preclude Rule 54(b) certification. Even in the event that the assessments are reduced to a lower percentage—an event that is by no means certain and, indeed, is not even expressly contemplated by the District Court in Pretrial Order Nos. 2622 or 2859—the *Benjamin, Fleming, Gooch–Kiel,* and *Hague* Appellants are objecting to the fact that they were subject to any assessment whatsoever. There is no plausible scenario under which their liability would reduce to zero or an amount ap-

proaching zero. In this respect, there is not a great possibility that future developments will moot the issues raised by the four Appellants.

With respect to the third factor, there does not appear to be a significant possibility that the same issues would be presented for review a second time. There is some overlap among the issues raised in the *Benjamin, Fleming, Gooch–Kiel,* and *Hague* appeals. They all challenge the District Court's finding that they benefitted from the work of the Plaintiffs' Management Committee ("PMC").[35] Given that this issue has been raised for appellate review in only a relatively small number of the total cases in which funds were sequestered for the MDL Fee & Cost Account, there is not a high probability that this argument would be raised again.

Lastly, the miscellaneous factor of delay argues (albeit slightly) in favor of review. For the reasons discussed above and in Judge Garth's opinion, it is not yet known when a final fee award will be rendered. It has already been more than two years since the District Court entered Pretrial Order No. 2622. Even though it appears that the final fee award will be made well before 2016, the four Appellants face delay that is not insignificant.

Viewing all of the *Allis–Chalmers* factors together, this case is one in which a court could find Rule 54(b) certification is warranted. Assuming that the settlement remains sound—a matter that the District Court is much better-situated to assess—the resolution of these issues by our Court would be consistent with Rule 54(b)'s policy of striking a "balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis–Chalmers Corp.,* 521 F.2d at 363.

## II. Collateral Order Doctrine

As an avenue apart from Rule 54(b) certification, interlocutory orders may be immediately appealed if the order falls within the narrow confines of the collateral order doctrine.[36] First brought into play by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the collateral order doctrine provides a narrow exception to the general rule permitting appellate review only of final orders. *In re Ford Motor Co.,* 110 F.3d 954, 958 (3d Cir.1997). Under this doctrine, an appeal of a nonfinal order is appropriate if: (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment. *Id.; see also United*

---

**35.** To repeat what is already noted in the majority opinion, the PMC performed work (or assigned work to other attorneys) for the common benefit of plaintiffs in MDL 1203 and in any coordinated state-court proceedings. Among other things, the PMC oversaw pretrial proceedings on behalf of plaintiffs, conducted discovery of widespread applicability, and compiled a widely applicable trial preparation package.

**36.** Rule 54(b) and the collateral order doctrine are conceptually distinct exceptions to the finality rule. Prior to the adoption of Rule 54(b), the entire case was typically treated as a single judicial unit that could give rise to only one appeal, even if that case consisted of numerous discrete claims or numerous parties. Rule 54(b) was therefore designed to relax the "judicial unit" aspect of finality in response to the increasing demands and frequency of complex litigation. *See Shipes v. Trinity Indus., Inc.,* 883 F.2d 339, 342 (5th Cir.1989). The collateral order doctrine is, in contrast, a judicially created exception to the statutory finality requirements that permits appeals from orders that would otherwise be considered interlocutory. *See id.*

*States v. Bertoli,* 994 F.2d 1002, 1010 (3d Cir.1993) ("The flexibility given by *Cohen,* commonly called the collateral order doctrine, permits appeal of some district court orders that do not terminate the entire case, or even a discrete part of it."). If the order at issue fails to satisfy any one of the three prongs, it is not an appealable collateral order. *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 276, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). Courts have reached mixed conclusions with respect to whether interim fee awards are appealable under the collateral order doctrine. *See Dardar v. Lafourche Realty Co.,* 849 F.2d 955, 957 n. 8 (5th Cir.1988) (collecting cases).

## A.

Under the first prong of the collateral order doctrine test—labeled the "conclusiveness prong"—the order appealed must "finally resolve a disputed question." *Praxis Properties, Inc. v. Colonial Sav. Bank, S.L.A.,* 947 F.2d 49, 54 (3d Cir. 1991). In determining this, the Supreme Court has contrasted two types of orders: those that are "inherently tentative" and those that are "technically amendable, but made with the expectation that they will be the final word on the subject addressed." *Christy v. Horn,* 115 F.3d 201, 204 (3d Cir.1997) (citing *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S.

271, 277, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988)).

The conclusion that the conclusiveness prong is not met in our case would be far less certain, however, if the District Court had not indicated a willingness to make a final fee award when the "entire picture is less clouded," Pretrial Order No. 2622 at 25, which suggests that the fees will be awarded when practical—presumably well before 2016. Though there is scant indication it intends to do so, the Court is free to revisit its allocation of fees through June 30, 2001. Moreover, it has expressly declined to make a final fee award so that the *Gunter* factors may be applied. In this context, while I do not share my colleagues' view that the conclusiveness prong is clearly not satisfied, the current state-of-play nonetheless tilts to the conclusion that conclusiveness does not yet exist.[37]

## B.

The case law addressing whether orders respecting interim fee awards fit within the collateral order doctrine places considerable weight on the fact that the fee awards can generally be reviewed at the conclusion of the litigation in the district court. However, an interim fee order may be reviewable when the "mere payment of the fees would make them unrecoverable." *Ruiz v. Estelle,* 609 F.2d 118, 119 (5th Cir.1980); *see also, e.g., Palmer v. City of*

---

**37.** Regarding the second prong of the collateral order test, this is a case in which the issues surrounding the attorneys' fee allocation are separate from the merits of the underlying litigation. *See White v. New Hampshire Dep't of Employment Sec.,* 455 U.S. 445, 452, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (explaining that an award of attorney's fees "is uniquely separable from the cause of action to be proved at trial"). Furthermore, the second prong of *Cohen* contemplates orders that are important in a jurisprudential sense. *See Praxis Properties,* 947 F.2d at 56 (citing

*Nemours Found. v. Manganaro Corp.,* 878 F.2d 98, 100 (3d Cir.1989)); *see also Nixon v. Fitzgerald,* 457 U.S. 731, 742, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) ("*Cohen* established that a collateral appeal of an interlocutory order must 'present a serious and unsettled question.'") (citation omitted). Given the novelty of the issues implicated in the underlying class action and the lack of guidance from our Court on the allocation of attorneys' fees in the context of our case, I believe this aspect of the second prong is easily met.

*Chicago,* 806 F.2d 1316, 1319–20 (7th Cir. 1986).

The Seventh Circuit Court of Appeals has addressed the unreviewability prong of the collateral order doctrine in the context of interim fee awards in a series of cases beginning with *Palmer,* in which the Court held that an interim fee award was appealable when fees were to be paid not to attorneys but to a "revolving fund" for prisoner-plaintiffs. 806 F.2d at 1319–20; *see also, e.g., People Who Care v. Rockford Bd. of Educ.,* 171 F.3d 1083, 1086 (7th Cir.1999); *Constr. Indus. Ret. Fund v. Kasper Trucking, Inc.,* 10 F.3d 465, 468 (7th Cir.1993); *People Who Care v. Rockford Bd. of Educ.,* 921 F.2d 132, 134–35 (7th Cir.1991); *Richardson v. Penfold,* 900 F.2d 116, 117–18 (7th Cir.1990). In a subsequent case, the Seventh Circuit indicated that although interim awards "are not final in the traditional sense ... [,] they are appealable under the collateral order doctrine when the defendant may have difficulty getting the money back." *People Who Care,* 921 F.2d at 134. In this respect, the crucial consideration in determining that an order is immediately appealable is whether "postponing appellate review till the end of the case would cause substantial irreparable harm to the party against whom the order was directed." *Palmer,* 806 F.2d at 1319.

My colleagues emphasize that the fee distributions at issue in this case have been made to counsel instead of to the parties. *Cf. id.* at 1319 (explaining that if the "fees would have been disbursed to the lawyers rather than retained by the prisoners and defendants, the problem would be less serious.... [W]e assume that the district court has an inherent power to order attorneys to whom fees were paid over by their clients pursuant to court order to repay the fees should the order be reversed."). Although that consideration

is relevant in the short-term, in the long-run this fact becomes a less compelling basis for finding that the unreviewability prong is not met. Whether the funds are distributed to an attorney or to a private litigant, it is difficult to maintain a high degree of confidence that either will remain available to be returned for re-distribution if the final tabulation were not to be made for more than a decade. For this reason, if it did not appear that a final distribution will occur in the relatively near future, this case, as a practical matter, would fall much closer to the situation in *Palmer,* where review was necessary to avoid irreparable harm.

## III. Fee Allocation Procedures

The District Court described the task of allocating $160 million in counsel fees as "herculean." Pretrial Order No. 2859 at 5. This description was apt. By the time the Court entered the order allocating interim fees, the litigation had spanned more than five years, produced more than 2800 orders, and resulted in a complex Settlement Agreement that had been amended multiple times. *See id.* In light of the size of this task and our Court's prior lack of exploration of the issues involved in such an allocation, discussion of the merits follows. The discussion in this section is not intended to express a view on the correctness of the actual allocation among counsel (save my comment in B.1 below), but rather addresses the procedure by which the allocation was rendered.

### A.

As noted, our Court has offered little guidance on how fees should be allocated among counsel in MDL class actions. The most direct guidance came in a footnote in which we posited that the approach of allowing lead counsel to allocate and distribute counsel fees among various law

firms frees district courts from "undertak[ing] the difficult task of assessing counsels' relative contributions." *In re Prudential Ins. Co. of Am. Sales Litig.,* 148 F.3d 283, 329 n. 96 (3d Cir.1998).

Perhaps implicitly acknowledging the lack of detailed guidance from our Court, Appellees cite a number of decisions in which courts have delegated the task of allocating fees among counsel to lead counsel or have relied on an agreement reached by counsel. *See, e.g., In re Linerboard Antitrust Litig.,* 333 F.Supp.2d 343, 351 (E.D.Pa.2004); *In re Copley,* 50 F.Supp.2d 1141, 1147–50 (D.Wyo.1999); *In re Indigo Sec. Litig.,* 995 F.Supp. 233, 234 (D.Mass. 1998); *In re Magic Marker Sec. Litig.,* 1979 WL 1248 (E.D.Pa. Sept.16, 1979), 1979 U.S. Dist. LEXIS 9777; *In re Ampicillin Antitrust Litig.,* 81 F.R.D. 395, 400 (D.D.C.1978); *DelNoce v. Delyar Corp.,* 457 F.Supp. 1051, 1055 (S.D.N.Y.1978). In one of the earlier decisions to address these issues, the judge went as far as to say that "it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk." *In re Ampicillin Antitrust Litig.,* 81 F.R.D. at 400. He then accepted the "unanimous position of [the] attorneys ... that the Court should take no part in the ultimate division of any fee awarded ... [and] defer[ed] to the attorneys' request that the fee award be made to" the committee of counsel for the settling class. *Id.* More recently, a court has justified delegating the task of formulating a proposed fee allocation as follows:

> Attorney fee allocation is an unenviable task for any court. It is a difficult matter that, frankly, even the trial court is often not in the best position to decide. This is especially true in complex class actions, like the one at bar. In such a circumstance, ideally, allocation is a private matter to be handled among class

counsel. The rationale for this policy is both logical and practical. Class counsel are better able to decide the weight and merit of each other's contributions.

*In re Copley,* 50 F.Supp.2d at 1148 (quotations and citations omitted).

Against this background and in view of the slowly emerging consensus (or, at least, trend) that it is difficult for courts to assess the contribution of various counsel to the litigation, the District Court here decided to create a five-member Fee & Cost Allocation Committee (the "Allocation Committee"). Three of the five attorneys on the Allocation Committee are members of the PMC, the body of attorneys that oversaw the coordinated and consolidated pretrial proceedings and conducted discovery of widespread applicability on behalf of plaintiffs in this multidistrict litigation. Two of the five members of the Committee are partners in the same law firm—Levin, Fishbein, Sedran and Berman ("Levin, Fishbein").

Under Pretrial Order No. 2622, the Allocation Committee had forty-five days to propose an allocation of the $160 million. It held meetings during that period in secret and in late November 2002 issued a report with its proposed allocation. That proposal set aside approximately $28.7 million from the interim class fee award for counsel in certified class actions in various state courts and certain other attorneys who had performed services that contributed to class recovery and were entitled only to recover from the Fund A Legal Fee Escrow Account ("Fund A") or the Fund B Legal Fee Escrow Account ("Fund B").

The Allocation Committee then combined the remaining fees available from Fund A with those funds approved for the payment of fees from Fund B and the MDL 1203 Fee & Cost Account. These

funds totaled approximately $131 million. The Allocation Committee formulated a plan to allocate this amount to more than two dozen law firms entitled to share in both the interim award of class fees and the interim award from the MDL 1203 Fee & Cost Account. In arriving at its proposed allocation, the Allocation Committee considered the relative contribution of each MDL Firm to various stages of the litigation. Within each stage of the litigation, it considered certain factors to determine the contribution of each firm, including, among other things, the: (1) quality of the work performed and relative skill and efficiency of the attorneys involved; (2) duration and intensity of the firm's commitment to the litigation; (3) level at which firm partners participated in the litigation; and (4) extent to which the firm was engaged in the litigation for the common benefit of the class members independent of any case specific recoveries. *See* Pretrial Order No. 2859 at 6–7. The Allocation Committee also examined each firm's reported lodestar [38] as determined by the court-appointed auditor. Generally, it considered the lodestar for each firm through June 30, 2001, but added over $6.3 million to the lodestar for the Levin, Fishbein firm to reflect time expended on matters up to September 30, 2002. After weighing the above criteria, and reviewing the various lodestars, the Allocation Committee measured the relative contribution of each firm and quantified that contribution by assigning the firm a percentage of the interim award.

A number of firms—including the *Bloom, Lopez–Hodes,* and *Nisen & Elliott* Appellants—filed objections to the Allocation Committee's proposed allocation with the District Court. In May 2003, in Pretrial Order No. 2859 the District Court

approved the Committee's fee allocation with the exception of modifying the award to exclude the Levin, Fishbein fee award for time incurred after June 30, 2001. *See* Pretrial Order No. 2859 at 22–23. As a result of the order, 52% of the MDL portion of the fee award was allocated to three law firms to which four out of five Allocation Committee members belong, and one firm (with two of its attorneys on the Allocation Committee) received nearly $58 million of the $131 million allocated to MDL firms. The *Bloom, Lopez–Hodes,* and *Nisen & Elliott* Appellants essentially challenge, *inter alia,* the District Court's almost complete approval of the Committee's allocation.

### B.

A review of the various decisions addressing the allocation of attorneys' fees among counsel reveals two competing lines of analysis—the delegation approach and the reexamination approach. The former rests generally on practical considerations and stems from decisions which, for the most part, have not involved numerous serious objections to both the outcome of the fee allocation and the procedure from which the fee allocation was set.

Although the delegation approach has gained acceptance, it is not beyond criticism. Significantly, along the line of analysis of the reexamination approach, the Second Circuit Court of Appeals has acknowledged that there is "authority for a court, under certain circumstances, to award a lump sum fee to class counsel in an equitable fund action under the lodestar approach and then to permit counsel to divide this lodestar-based fee among themselves under the terms of a private fee sharing agreement...." *In re "Agent*

---

**38.** Under the "lodestar" method, the number of hours reasonably expended by an attorney is multiplied by a reasonable hourly rate to calculate attorneys' fees.

*Orange" Prod. Liab. Litig.,* 818 F.2d 216, 223 (2d Cir.1987). The Second Circuit rejected this authority, however,

> to the extent it allows counsel to divide the award among themselves in any manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of class interests under [Federal Rule of Civil Procedure] 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases.

*Id.*

With these considerations in mind, there are at least three ways in which the fee allocation here may be cause for concern. These concerns, however, can be addressed in a way that serves the court's role as protector of class interests without abandoning the approach of looking to the views of counsel for assistance.

### 1. *Exclusion of Unaudited Time*

The District Court's sole disagreement with the Allocation Committee's proposed apportioning to the MDL firms was the latter's inclusion of approximately $6.3 million in unaudited time in the proposed award to Levin, Fishbein. After indicating that it had reviewed the award to Levin, Fishbein with "special care" because of the "potential for unfairness," the District Court excluded the unaudited time out of an "abundance of caution" so that the "allotments [would] all involve approximately the same time period." Pretrial Order No. 2859 at 22–23.

The decision simply to reduce the amount of Levin, Fishbein's award (and the total amount of the interim fee award) by the lodestar amount of $6.3 million is inconsistent with the manner in which the Allocation Committee arrived at its proposed fee allocation. That is, it did not recommend an award of fees simply on the basis of the lodestar. Instead, after weighing the various factors, the Committee allocated a percentage of the total fee award to each firm. Levin, Fishbein received 44% of the fees, which was approximately 2.38 times the amount of its lodestar. Arguably, then, the District Court should have reduced Levin, Fishbein's award by 2.38 times the lodestar sum of $6.3 million (that is, by approximately $15 million) or reassessed Levin, Fishbein's contribution or directed the Committee (perhaps absent its Levin, Fishbein members) to reconsider its allocation recommendation.

### 2. *Consultation with the State Judges' Committee*

Evidently in view of certain legal requirements under Illinois law limiting the recovery of medical monitoring costs, the District Court excluded users of diet drugs residing in Illinois from the nationwide certified class. *See* Pretrial Order No. 865. A state-wide class was certified in Illinois state court in December 1998, several months prior to the initiation of "global" settlement discussions and prior to the certification of the nationwide federal class in August 1999. The Settlement Agreement, entered into in November 1999, provided, *inter alia,* that class members were entitled to: (1) reimbursement if they obtained private echocardiograms prior to the implementation of the settlement; and (2) refunds for the diet drugs they purchased. These remedies had been pursued by the *Nisen & Elliott* Appellants with respect to the class certified in Illinois state court.

As a means of assisting the District Court in matters pertaining to the settlement and the award of counsel fees, the Settlement Agreement called for the creation of a judges' committee:

A State Court Judicial Advisory Committee ... will consist of the judges from the State Courts which, as of October 7, 1999, had issued any order certifying state-wide class actions in relation to the effects of Pondimin and/or Redux. The State Court Judicial Advisory Committee shall provide advice and counsel on all matters pertinent to the Settlement.... In addition, prior to making any award of counsel fees and reimbursement of litigation expenses, the Federal District Court *shall consult with and give substantial deference to the views of the State Court Judicial Advisory Committee concerning the actual contribution which was made to the overall resolution of the litigation by the attorneys with whom the members of the committee are familiar.*

(emphasis added). The District Court established the State Court Judicial Advisory Committee (the "State Judges' Committee"), and it met on several occasions with the District Court prior to June 2001.

Following the District Court's approval of the Settlement Agreement, attorneys from the MDL firms and attorneys representing the class actions pending in various state courts filed a joint petition for an award of attorneys' fees, collectively requesting more than $400 million. Before the joint petition was filed, a private fee-sharing agreement had been negotiated by attorneys representing class actions in Texas, New York, New Jersey, Pennsylvania, and West Virginia. The *Nisen & Elliott* Appellants in Illinois[39] were not parties to that agreement. Under it, the attorneys representing the class actions in those five states would receive approximately 97% of fees potentially available for allocation to state court counsel. The Allocation Committee recommended an award to the *Nisen & Elliott* Appellants that they objected to as significantly understating their contribution to the nationwide settlement, which included the remedies noted above.

The District Court rejected the *Nisen & Elliott* Appellants' argument:

The real issue is whether the allocation proposed by the [Allocation] Committee for Illinois counsel ... is fair and reasonable. Ultimately, the Committee analyzed Illinois counsel's participation in this litigation as it had the other firms, by considering their relative contribution to the overall outcome of the litigation. In the context of the entire litigation, the efforts of the Illinois firms, though valuable and inuring to the common benefit of the Class, were limited. Outside of the state class certification in Illinois, these firms performed little, if any, work on this matter.

Pretrial Order No. 2859 at 31–32 (footnote omitted). Thus the District Court found that the Allocation Committee's recommended award was fair and reasonable without mentioning the State Judges' Committee, notwithstanding that the *Nisen & Elliott* Appellants had requested that the District Court consult with State Judges' Committee.

Moreover, in a letter that was dated just two days before the District Court's hearing on the recommended fee allocation, a member of the State Judges' Committee—Justice Ellis Reid of the Appellate Court of Illinois, First District (who had presided over the Illinois diet drug class action when he was the Circuit Court Judge for the Circuit Court of Cook County, Illinois)—wrote to the District Court. The letter pointedly questioned the District Court's procedures with respect to fee allocations:

---

39. The *Nisen & Elliott* Appellants include four of the five law firms that represented the state-wide certified class in the Illinois diet drugs litigation. The fifth firm that represented the Illinois class did not object to the fee allocation.

As a member of the State Court Judicial Advisory Committee it was my understanding, based upon the provisions of the Nationwide Settlement Agreement, that my views concerning the contributions made by Illinois [counsel] would be given substantial deference in any award of counsel fees to the state court attorneys who represented the six statewide class actions certified prior to the Nationwide Settlement. I am writing to express my concerns that this has not happened and, as a result, certain Illinois class counsel are being prejudiced.

Justice Reid further questioned the appropriateness of the Allocation Committee's recommended portion to the *Nisen & Elliott* Appellants.

The *Nisen & Elliott* Appellants argue that the District Court's failure to consult with the State Judges' Committee ignored the terms of the Settlement Agreement. They are correct. Under the express terms of the Settlement Agreement approved by the District Court, the State Judges' Committee should have been consulted. This is significant from a procedural standpoint, notwithstanding the fact that the state court counsel had entered into the fee-sharing agreement. The members of the State Judges' Committee, unlike those of the Allocation Committee, did not have a financial interest in the outcome of the fee allocation. In such a complex case, soliciting and taking into account the views of disinterested jurists familiar with the proceedings should have occurred. Those views would provide a valuable procedural check on at least some of the recommendations of the Allocation Committee.

3. *Degree of Deference to the Committee's Recommendations*

There is yet another aspect of the fee allocation process that raises serious questions about how the Allocation Committee's proposed "cutting-up-the-pie" should be reviewed by the District Court. The Court afforded a high degree of deference to the Allocation Committee's recommendation, stating: "Although the ultimate decision with respect to the award and allocation of counsel fees is reserved for the court, we will give substantial deference to the recommendation of the Committee as long as we conclude the recommendations are fair and reasonable." Pretrial Order No. 2859 at 15–16. Further, a comparison between the District Court's opinion and the Allocation Committee's explanation of its recommended fee apportioning through June 30, 2001 reveals that the District Court tracked the Committee's recommendation to the dollar.

The District Court correctly points out that other courts have afforded deference to the views of lead counsel in allocating awards of fees. *In re Copley*, for example, explained:

In the case at bar, when the Court became aware that class counsel could not reach a unanimous stipulation, it necessarily gave substantial deference to Lead Counsel's proposed allocation. In a case of this magnitude, the assistance of Lead Counsel on matters such as this is especially invaluable. Accordingly, this Court, after reviewing the previous submissions of class counsel as to hours and expenses, relying on previous discussions with Lead Counsel as well as other members of class counsel, and weighing the relative responsibilities of class counsel members and their contribution to this litigation, as well as when respective attorneys became involved in this litigation, found Lead Counsel's allocation to be fair and reasonable.

50 F.Supp.2d 1141, 1147–50 (D.Wyo.1999) (citations omitted); *see also, e.g., In re*

*Indigo Sec. Litig.*, 995 F.Supp. 233; 234 (D.Mass.1998). Likely because of perceived practical necessity, courts have shown an eagerness to defer to counsel's views in allocating attorneys' fees.

But counsel have inherent conflicts. They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens? A template I suggest for consideration is our deference-determination scale in Employee Retirement Income Security Act ("ERISA") cases. In *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir.2000), we addressed the standards to be employed in reviewing the denial of a request for benefits under an ERISA plan by an insurance company that both determines eligibility for benefits and pays those benefits out of its own funds. That is, we considered what standard of review is appropriate when "the nature of the relationship between the funds, the decisions, and the beneficiary invites self-dealing. [A]n inherent conflict [exists] between the roles assumed by an insurance company that administers claims under a policy it issued.... Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." *Id.* at 384–85 (quoting *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1561 (11th Cir.1990)). After surveying the law in other circuits, we rejected the requirement that bias must be specifically demonstrated, and adopted a sliding scale approach to the standard of review. *Pinto*, 214 F.3d at 389–93. That approach allows each case to be examined on its facts. The court may take into account the sophistication of the parties, the information accessible to them, and the exact financial arrangement between the insurer and the company. *Id.* at 392.

While the analogy between *Pinto* and our case is imprecise (*Pinto* considered the fiduciary duties of insurers), *Pinto*'s teachings remain relevant for several reasons. First, it illustrates a willingness to examine critically decisions of non-judicial bodies that may have a financial interest in the outcome of their decisions or recommendations. Second, *Pinto* supports the view that, when a conflict of interest is present, the reviewing court should consider on a fact-specific basis how much deference should be afforded to the views of a group potentially affected by self-dealing.

Though the insurance companies discussed in *Pinto* may have been affected by a "structural conflict of interest [that] unconsciously encourage[d] even a principled fiduciary to make decisions that are not solely in the interest of the beneficiary," *id.* at 384 (discussing *Brown*, 898 F.2d at 1561), the members of the Allocation Committee had a direct conflict of interest: they were suggesting to the District Court how to proceed on matters near and dear—dividing a limited fund among themselves and other firms. Such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate.

While the District Court's allocation may ultimately be fair, careful attention must be paid to the procedures by which the allocation is set. In this regard, there is room for flexibility. To the extent the District Court chooses to rely on the recommendations of a committee of interested attorneys, it then becomes necessary to scrutinize more closely those recommendations. By soliciting the views of less interested individuals or a disinterested body like the State Judges' Committee, and al-

lowing objections, the conflict of interested counsel becomes less of a factor.

\* \* \* \* \* \*

I join my colleagues' conclusion that appellate jurisdiction does not exist in our case. However, I am not as sanguine as they that plausible arguments do not exist in certain circumstances for appellate jurisdiction under Rule 54(b) or the collateral order doctrine. The rest—attending to attorneys' fee allocations—is but *dicta* once removed. It is, however, an attempt to forestall claims that courts that follow recommendations of fee allocation committees controlled by counsel with conflicts exercise scrutiny-lite.